[No. S004356. Crim. No. 21844. July 11, 1988.]

THE PEOPLE, Plaintiff and Respondent; v.
JERRY THOMAS BUNYARD, Defendant and Appellant.

**COUNSEL**

George L. Schraer, under appointment by the Supreme Court, and Michael G. Millman for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Jane N. Kirkland and Joel Carey, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARGUELLES, J.**—Defendant Jerry Thomas Bunyard was convicted by jury of the first degree murders (Pen. Code, § 187)[1] of his wife Elaine Bunyard (Elaine) and of Elaine's full-term, healthy fetus (Baby Girl Bunyard.) The jury also found true one special circumstance allegation: that defendant had committed multiple murders (§ 190.2, subd. (a)(3)).[2] Defendant was sentenced by the jury to death. This appeal is automatic (§ 1239, subd. (b)) and arises under the 1978 death penalty law. (§ 190.1 et seq.)

As we shall explain, we conclude that the guilt verdicts and special circumstance finding should be affirmed, but that the penalty judgment must be reversed under *People* v. *Ramos* (1984) 37 Cal.3d 136, 150-159 [207 Cal.Rptr. 800, 689 P.2d 430].

## I. FACTS

On November 1, 1979, Elaine, a pregnant woman ready to give birth any day, was discovered dead in the garage of her home by her seven-year-old daughter, Tanya. Medical testimony at trial established that Elaine had died from a massive shotgun wound to the head, and that her full-term fetus had suffocated moments later from the resulting lack of oxygen. The evidence was uncontroverted that Elaine was killed by Earlin Popham, a childhood friend of defendant. Popham testified at trial that he was hired by defendant to kill Elaine.[3] In summary, Popham's testimony was as follows:

Earlin Popham, also known as Earlin Laudeman, was a drifter, small-time criminal, and frequent drug user who had known defendant since grade school. Around October 1979, two or three weeks before the murders, Popham learned that defendant wanted to see him, and he met with defendant at the Bunyard home. Defendant advised Popham that he had a job for Popham: assisting with a building project in Patterson. Popham accepted the job and began living at the Bunyard residence intermittently.

---

[1] Statutory references are to the Penal Code, unless otherwise indicated.

[2] The jury found not true a "financial gain" special-circumstance allegation. (§ 190.2, subd. (a)(1).)

[3] Prior to trial, Popham pleaded guilty to the first degree murder of Elaine, and testified for the People in exchange for a prison sentence of 25 years to life.

During this time, Popham and defendant began to discuss defendant's marital situation, and defendant asked Popham if he would kill Elaine for a fee. Defendant gave numerous reasons for his request: Elaine was pregnant by another man; he had offered Elaine $50,000 in settlement for a divorce, but she had refused; in a contested divorce Elaine would take everything defendant had; and that he wanted to be with or marry his new girlfriend, Sarah Pender, who was wealthy or had a wealthy father. Defendant offered to pay Popham $1,000 within a week after the killing, followed by payment of additional money when defendant received the proceeds of an insurance policy. Defendant additionally offered to employ Popham as a caretaker of his ranch after Elaine's murder, and told Popham that he would be welcome to move to Arkansas with defendant, defendant's father, and defendant's girlfriend Sarah Pender.

While at first Popham declined defendant's offer, when defendant persisted Popham, being sympathetic to defendant's situation and in need of money, eventually agreed to kill Elaine, knowing that she was pregnant. This agreement was reached about one week before the murders occurred.

Popham testified that defendant's plan was to make the murder look like a suicide. Popham was to knock Elaine out in the kitchen, drag her into the garage where defendant had hidden his pump shotgun, and then stage a "shooting" suicide. Defendant believed this plan would be successful due to Elaine's "mental problems" during her pregnancy. Additionally, defendant told his father Clarence, who lived next door, to go fishing and not be at home during the week when defendant was asking Popham to carry out the murder plan. The date was left up to Popham, but defendant repeatedly asked Popham if today would be the day, including October 31, the day before the murders.

Finally, on the morning of November 1, when defendant asked if Popham would carry out the plan that day, Popham replied "probably." Waiting until after defendant and Tanya left the house, Popham walked up behind Elaine while she was in the kitchen washing dishes and struck her repeatedly on the head with frying pans to knock her out. He then dragged her while unconscious to the garage, placed her in a chair, propped defendant's shotgun under Elaine's chin, and pulled the trigger, blowing off half her head and face. Realizing that a trail of blood from the kitchen to the garage, and signs of a struggle in the kitchen—including two shattered pans—would not look like a suicide, Popham decided to make it appear to be a robbery by knocking over some furniture, and taking $5 from Elaine's purse.

Popham then drove to the construction project where defendant was working, and talked with defendant in hushed tones for a few minutes. He

informed defendant that "it was done," and that he would meet him in town at the A & W at noon. That meeting was held at the appointed time and place, with Popham telling defendant that Elaine had been killed but that "it ain't going to look like a suicide." When Popham said he needed some money, defendant withdrew $175 from his bank and gave $125 to Popham. Popham told defendant that he would call defendant within a week regarding further payments. Two days after the murder, Popham tried to contact defendant by calling the house of defendant's father, Clarence Bunyard, who informed Popham that his son was at his (defendant's) home. Popham then reached defendant by phone at his own home. Although defendant asked Popham to call him at his father's house later that night, Popham did not call again. Telephone records at trial confirmed that a short call had been placed from a residence in San Jose, where Popham was staying, to defendant's home two days after the murders.

Other witnesses at trial, including defendant, testified that in the afternoon of November 1—the date of the murders—defendant went to the Tracton Bar after work and drank heavily. Thereafter, defendant visited Sarah Pender, arriving at her home around 6:40 p.m., in an intoxicated condition. There, he was advised by both his mother and Sarah Pender of the death of his wife.

Testimony at trial established that Elaine had been murdered. Suicide was ruled out because Elaine's arms were too short to have put the barrel of the shotgun under her chin and still have pulled the trigger, and Popham's fingerprints were found on the shotgun. The physician who examined Elaine two days before her death stated that Baby Girl Bunyard at that time had a fetal heartbeat of 140, was due between November 1 and 7, and was normal. The pathologist testified that the fetus was a normal, healthy term infant which weighed eight pounds, two ounces, was in proper position for delivery, and would have been born any day.

On November 2, 1979, one day after the murders, news of Elaine's "suicide" became public. Randy Johnson immediately contacted police authorities. He testified that, although not acquainted with Popham, he (Johnson) had also been asked repeatedly by defendant to kill Elaine. Johnson testified that early in his five-year friendship with defendant, defendant had asked him five to ten times to kill Elaine and Tanya, then later Elaine alone; that defendant made twenty such requests during the first year of their friendship and even raised the offer from $1,000 to $5,000 to $10,000, but Johnson always declined. Later, when Johnson moved in with the Bunyards in the spring of 1979, receiving room and board in return for help with the ranch, the offers continued. Even after Johnson left the Bunyard residence, the offers continued, for a fee as high as $20,000, but Johnson never acquiesced.

Although Johnson never apprised Elaine of her danger, he did mention it to the police prior to the actual murders, as well as to both his sister, Deanna Johnson, and his half brother.

Defendant testified on his own behalf at the guilt phase but did not challenge Popham's testimony that he (Popham) had murdered Elaine and her full-term fetus. Defendant presented an alibi defense and denied any involvement in the murders. Although defendant also denied desiring to divorce his wife, he admitted to striking her on occasion and to carrying on an affair with Sarah Pender, who he testified was his mistress. The defense at trial consisted primarily of an attack on the credibility of Johnson and Popham; defense counsel argued that Popham was lying to save himself from receiving the death penalty. Defendant denied ever soliciting either Johnson or Popham to kill anyone. Defendant further testified that he could think of no reason why Popham killed his wife.

At the penalty phase, the prosecution submitted its case on the basis of the guilt phase evidence. The defense presented one witness, Nathan Eli, who had been sentenced to death twice, twenty years earlier, but had been released from prison and was then employed as an office manager in a San Francisco law firm. The thrust of his testimony was that "lifers" make good prisoners.

## II. GUILT PHASE ISSUES

Defendant makes a number of contentions related to the issue of guilt. None, as we shall explain, establishes reversible error.

### A. *Evidentiary Issues*

#### 1. *Victim's Statements to Dr. Brown*

Defendant argues that the trial court committed reversible error in admitting testimony of Dr. Brown, Elaine's physician, relating statements made to him by Elaine during a routine examination in her last month of pregnancy, in which she indicated that defendant had assaulted her on several occasions and expressed her fear of defendant. Although the statements should have been excluded, we conclude that the error does not warrant reversal.

After Dr. Brown testified that he had observed bruises upon Elaine on two occasions during her pregnancy, the following colloquy occurred over defendant's objection: [¶] "Q. And did you ask Mrs. Bunyard for any explanation of these marks? [¶] "A. Yes, I did. Q. And what, if anything,

did she tell you? [¶] A. Well, she told me that her husband [defendant] had done it." Thereafter, Dr. Brown testified that he advised Elaine to call the police and, over defendant's objection, related Elaine's response that "if I did anything like that, he'd [defendant] kill me."

In response to defendant's hearsay objection, the prosecution conceded that the statements might be hearsay but argued that they were highly credible because made to a treating physician, and further argued that the statements were admissible because of their relevance to Dr. Brown's medical treatment of Elaine and to Elaine's precarious mental state during the last month of her pregnancy. The trial court concluded that these statements were admissible "for the history that the patient gives to a treating physician," and proceeded to admonish the jury accordingly, directing them to consider the statements not for their truth but "merely in response to Dr. Brown's requests and for use by Dr. Brown for any treatment, if necessary." (Evid. Code, § 1200.)

We believe that the trial court ruling was in error. Past cases make it clear that an out-of-court statement is not made admissible simply because its proponent states a theory of admissibility not related to the truth of the matter asserted. As this court recently observed, "[a] hearsay objection to an out-of-court statement may not be overruled simply by identifying a nonhearsay purpose for admitting the statement. The trial court must also find that the nonhearsay purpose is relevant to an issue in dispute." (*People* v. *Armendariz* (1984) 37 Cal.3d 573, 585 [209 Cal.Rptr. 664, 693 P.2d 243].) Similarly, where the evidence involves a victim's fear of defendant, we have examined whether the victim's state of mind was truly in dispute and whether it was relevant to an issue in the case. (*People* v. *Thompson* (1988) 45 Cal.3d. 86, 103-104 [246 Cal.Rptr. 245, 753 P.2d 37]; *People* v. *Ruiz* (1988) 44 Cal.3d 589, 607-610 [244 Cal.Rptr. 200, 749 P.2d 854]; *Armendariz, supra,* 37 Cal.3d at pp. 584-590; *People* v. *Arcega* (1982) 32 Cal.3d 504; 526-528 [186 Cal.Rptr. 94, 651 P.2d 338]; *People* v. *Green* (1980) 27 Cal.3d 1, 23 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Ireland* (1969) 70 Cal.2d 522, 529-532 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].)

In this case, the record shows that neither Elaine's medical treatment nor her mental state were at issue. No argument was presented by either side to suggest that Elaine's death may have resulted from accident, self-defense, provocation or suicide, nor did the defense raise any issue of fact with respect to any conduct by the victim prior to her death. (Cf. *People* v. *Lew* (1968) 68 Cal.2d 774, 778-780 [69 Cal.Rptr. 102, 441 P.2d 942].) Since the articulated nonhearsay purposes of the statements

were simply irrelevant to any disputed issue, the statements should have been excluded.[4]

■ Nonetheless, we conclude that the error was harmless. No prejudice could have flowed from Elaine's attribution of her bruises to defendant since other witnesses, including Tanya and defendant himself, informed the jury that defendant struck Elaine repeatedly; Elaine's hearsay statements as to the assaults were thus simply cumulative.

Admission of Elaine's other remark—"if I did anything like that, [defendant would] kill me"—was also not prejudicial under the circumstances of this case. While the statement does display Elaine's fear of defendant, it was a fear based upon a condition precedent—her reporting his assaults to the police—and there was no evidence submitted to the jury that Elaine ever told the police about the beatings or that defendant thought that she had; indeed, the evidence is to the contrary. Moreover, the prosecution neither argued nor presented evidence to the jury suggesting that defendant had arranged the murder of Elaine to prevent her from reporting his beatings to the police; the record makes it clear that the remark played no role in the prosecution's proof of defendant's plans to have his wife killed. Unlike past cases finding prejudice (compare *Arcega, supra,* 32 Cal.3d at pp. 529-531; *People* v. *Coleman* (1985) 38 Cal.3d 69, 82-95 [211 Cal.Rptr. 102, 695 P.2d 189]; *Ireland, supra,* 70 Cal.2d at pp. 529-532), the remark was not exploited in argument nor did it evidence a present fear of imminent harm or death at defendant's hands, from which the jury might reasonably have inferred that defendant had previously formed an actual intent to kill his wife. Accordingly, it is not reasonably probable that the jury's verdict would have been different had these statements been excluded. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### 2. *Sufficiency of the Corroborating Evidence as to Accomplice Popham*

■ Defendant further argues that the judgment should be reversed because his conviction rests on the testimony of an accomplice whose

---

[4]The Attorney General further argues that the statements are nonhearsay and admissible as pointing to the cause of a physical condition. (See *People* v. *Deeney* (1983) 145 Cal.App.3d 647, 652, fn. 2 [193 Cal.Rptr. 608].) While a statement pointing to the cause of a physical condition may be admissible if it is made by a patient to a physician, the statement must be necessary to proper diagnosis and treatment and is admissible only to show the basis of a medical opinion, not for the purpose of establishing the truth of the facts contained therein. (*Johnson* v. *Aetna Life Insurance Co.* (1963) 221 Cal.App.2d 247, 252 [34 Cal.Rptr. 484]; accord, *Deeney, supra,* 145 Cal.App.3d at 652, fn. 2.) In the case at bar, the statements were irrelevant to proper diagnosis and treatment; moreover, Dr. Brown's treatment of Elaine's bruises was not a disputed issue, nor relevant to any other disputed issue.

testimony was not corroborated by sufficient and competent evidence, in contravention of section 1111. The People concede that defendant's conviction was based on the testimony of Popham, an accomplice as a matter of law, but contend that Popham's testimony was sufficiently corroborated by Johnson, who testified that defendant had also solicited him on numerous occasions to kill Elaine and Tanya. Contrary to defendant's claim, we conclude that Johnson's testimony provided competent and sufficient evidence to corroborate the testimony of accomplice Popham.

Section 1111 provides, in pertinent part, that "a conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." ■ In *People* v. *Perry* (1972) 7 Cal.3d 756 at page 769 [103 Cal.Rptr. 161, 499 P.2d 129], this court reviewed the standard by which the sufficiency of corroborating evidence is to be measured: "To corroborate the testimony of an accomplice, the prosecution must produce independent evidence which, without aid or assistance from the testimony of the accomplice, tends to connect the defendant with the crime charged. [Citation omitted.] 'The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necesary that the corroborative evidence be sufficient in itself to establish every element of the offense charged.' [Citations omitted.] . . . '[T]he corroborative evidence may be slight and entitled to little consideration when standing alone.' [Citations omitted.]" (Accord, *People* v. *Szeto* (1981) 29 Cal.3d 20, 27 [171 Cal.Rptr. 652, 623 P.2d 213].)

■ With these principles in mind, we conclude that Johnson's testimony of being offered money to kill Elaine is sufficient to corroborate the testimony of accomplice Popham. Johnson's testimony tended to connect defendant to the charged crime, did not depend on the testimony of Popham to make this connection, was highly probative of defendant's intent to kill his wife and his plan for so doing—hiring a friend to do the actual physical killing at defendant's behest and direction—and substantiated Popham's testimony and credibility. "Corroborating evidence is sufficient if it substantiates enough of the accomplice's testimony to establish his credibili-

ty [citation omitted]." (*People* v. *Knight* (1980) 111 Cal.App.3d 201, 205-206 [168 Cal.Rptr. 421].)[5]

■ Defendant also argues that Johnson's testimony is "incompetent" evidence of corroboration since the offers to pay Johnson to kill Elaine and Tanya constituted evidence of "prior criminal conduct," namely, solicitation to commit murder (§ 653f, subd.(b)), which was relevant only to prove criminal disposition and hence was erroneously admitted. Defendant's claims should be rejected. First, defendant never objected at trial to this testimony.[6] Any claim of error may therefore be deemed waived. (Evid. Code, § 353; *People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048].) In any event, Johnson's testimony was admissible as probative of defendant's plan to kill one of the victims. (Evid. Code, § 1101, subd. (b).) Where the "other crimes" evidence relates to the very same victim, it has been held admissible even when there is no issue of identity and no ambiguity about the proof of defendant's intent to show a defendant's "common design or plan" towards that victim. (Cf. *People* v. *Moon* (1985) 165 Cal.App.3d 1074, 1080 [212 Cal.Rptr. 101].) Thus, Johnson's testimony was properly admitted and its corroborative effect was permissible.[7]

Defendant further contends that Johnson's testimony cannot be competent corroboration of accomplice Popham's testimony since Johnson himself was a "suspect" source—a witness to a solicitation to commit murder. Since the crime of solicitation to commit murder requires for *conviction* either the testimony of two witnesses or of one witness and corroborating circumstances, defendant argues that Johnson's testimony was analogous to

---

[5] Contrary to defendant's claims, the holdings of *People* v. *Cox* (1951) 102 Cal.App.2d 285, 286-287 [227 P.2d 290], *People* v. *Singh* (1932) 121 Cal.App. 107, 108-110 [8 P.2d 898], and *People* v. *Reynolds* (1938) 26 Cal.App.2d 219, 220-222 [79 P.2d 150], are inapposite. Because defendant solicited both Popham and Johnson to kill the very same victim—who was not an accomplice—this case bears no resemblance to the foregoing cases which involved multiple victims who were also accomplices where the corroborative evidence ran afoul of the section 1111 requirement that such evidence tend to connect defendant to the crime without interpretation from the accomplice.

[6] Defendant concedes this point and now asserts that his counsel was ineffective for failing to object. As we explain *infra,* counsel was not ineffective in this regard, since Johnson's testimony as to the uncharged solicitations to commit murder was properly admissible.

[7] Defendant makes the related argument that Johnson's testimony of uncharged solicitations to commit murder was improperly admitted in violation of the rule that "other crimes" evidence may not be used solely to corroborate a chief prosecution witness. (See, e.g. *People* v. *Ogunmola* (1985) 39 Cal.3d 120, 123-124 [215 Cal.Rptr. 855, 701 P.2d 1173]; *People* v. *Tassel* (1984) 36 Cal.3d 77, 83-89 [201 Cal.Rptr. 567, 679 P.2d 1].) As we have explained, this contention lacks merit because Johnson's testimony—apart from its corroborative purpose—was admissible as proof of defendant's plan to kill Elaine Bunyard (Evid. Code, § 1101, subd. (b); *People* v. *Guerrero* (1976) 16 Cal.3d 719, 724 [129 Cal.Rptr. 166, 548 P.2d 366]).

that of an accomplice and that one "suspect" source cannot corroborate another. Defendant cites no authority supporting this contention,[8] and we can perceive no reason why the requirements for conviction of solicitation to commit murder would be relevant to this case. We reject defendant's contention.

In sum, we find that Johnson's testimony provided competent and sufficient evidence of corroboration under section 1111.[9]

3. *Rebuttal Evidence—Admissibility of Johnson's Prior Consistent Statements*

■ Defendant next argues that the court erred in permitting Deanna Johnson to testify during rebuttal that her brother Randy Johnson had told her of defendant's attempt to hire him to kill Elaine. The court ruled that Deanna's testimony was admissible pursuant to the "prior consistent statement" exception to the hearsay rule. (Evid. Code, § 791.) Deanna thereafter testified that around Eastertime in 1979, Johnson first told her that defendant had offered him money to kill Elaine; that her brother had mentioned defendant's offer on more than one occasion, and that Johnson mentioned a different amount of money as being offered each time this matter was discussed between Johnson and Deanna. Contrary to defendant's claims, we conclude that these statements were properly admitted as prior consistent statements under subdivision (b) of Evidence Code section 791, and that the trial court accordingly did not err.

---

[8] Defendant's reliance on *Reynolds* v. *State* (Tex. Crim.App. 1972) 489 S.W.2d 866 and *People* v. *Reingold* (1948) 87 Cal.App.2d 382 [197 P.2d 175] is misplaced. In both these cases, testimony of other solicitations or threats against the victim—albeit admissible—was found to be insufficient corroboration. In *Reynolds,* one of the judges—dissenting to the denial of the state's motion for rehearing—emphatically opined that the evidence of corroboration was sufficient in that case. Neither of the foregoing cases is authority for the unpersuasive notion that other solicitations or threats can never, as a matter of law, provide sufficient corroboration.

[9] Since we find that Johnson's testimony was sufficient to corroborate accomplice Popham, we do not need to assess the other evidence in the case which substantiated Popham's credibility. Nevertheless, we note that there were many other corroborative factors besides Johnson's testimony which demonstrated Popham's credibility as a witness and tended to connect defendant to the charged crimes: (1) another witness observed Popham talking with defendant in hushed tones at defendant's workplace soon after the killings; (2) telephone records showed a call was placed from the house where Popham was staying two days after the murders to defendant's home, as Popham testified; (3) defendant admitted at trial that he drank heavily, which he testified was not a common occurrence, on the day of the murders before being officially notified of his wife's death; (4) defendant acknowledged that he paid Popham $125 in cash on the day of the murders; and (5) defendant's father admitted that he had gone fishing during the week before the killings and was away from home at the time of the killings. "[D]efendant's own testimony and inferences therefrom as well as the inferences from the circumstances surrounding the entire transaction, may be sufficient corroborative testimony." (*People* v. *Ruscoe* (1976) 54 Cal.App.3d 1005, 1012 [127 Cal.Rptr. 6]; *People* v. *Wade* (1959) 53 Cal.2d 322, 329 [1 Cal.Rptr. 683, 348 P.2d 116].)

Evidence Code section 791 provides: [¶] "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: . . . . [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." In the present case, defense counsel's cross-examination of Johnson strongly implied that Johnson's testimony for the prosecution had been fabricated or influenced by the motive to avoid incarceration on a pending criminal matter. The defense brought out that Johnson had been convicted of second degree burglary in the summer of 1979 and had been placed on felony probation, and that he had a violation of probation charge pending, both at the time he gave a statement to police on November 2, 1979—one day after the killings—and at the time of his trial testimony. Defense questioning clearly intimated that Johnson might receive a penal benefit by testifying for the prosecution, although Johnson denied being offered such an inducement.[10] The mere asking of questions may raise an implied charge of improper motive even though the receipt of a penal benefit is denied. (See, e.g., *People* v. *Pic'l* (1981) 114 Cal.App.3d 824, 863 [171 Cal.Rptr. 106].)

We find that the defense impliedly charged that Johnson's testimony was improperly influenced by the motive to avoid a prison term if found in violation of his probation. Defendant's prior consistent statements to his sister were consistent with his testimony at trial and clearly arose prior to any implied improper motive was alleged to have arisen. Accordingly, we conclude that Deanna's testimony was properly admitted under subdivision (b) of Evidence Code section 791.

### 4. *Asserted Carter Error*

During the People's case-in-chief, Popham testified that two or three days after the murders, he made a phone call from San Jose to defendant's residence and spoke briefly to defendant. Popham's testimony during the People's case-in-chief was vague on the source of the billing for the call, although Popham indicated on cross-examination he may have billed the call to a corporation in Livermore.[11] The defense then sought to impeach

[10] "Q.[By defense counsel]: Okay. Has Mr. Lusk [Johnson's probation officer] indicated to you that you could do some jail time if you are violated? [¶] A. Yes. [¶] Q. Did he tell you you could do some prison time if you're violated? [¶] A. Yes. [¶] Q. Did he tell you that whether or not you do prison time might depend on the extent to which you cooperate in these proceedings, attend and testify here? [¶] A. No, he didn't. [¶] Q. Is it necessary for us to bring Mr. Lusk down here and put him on the stand? [¶] A. You can bring him down."

[11] On redirect examination, Popham admitted he could not be certain that he had billed the call to the Livermore corporation, that it could have been billed to another number, and that

Popham by testimony from a telephone company representative that no incoming calls to defendant's number or his father's number had been billed to the Livermore corporation Popham had named during early November 1979, and by testimony from defendant, his friend Steve Taylor who resided with defendant temporarily after the murders, and his father Clarence Bunyard that none of them received phone calls from Popham within two to three days after the murders.

On rebuttal, the People presented testimony of a telephone company representative—based on other telephone records first discovered during the defense case—and other witnesses which established that a short call had in fact been placed by Popham from a San Jose telephone number to defendant's residence on November 3, 1979, two days after the murders. The court ruled—over defendant's objection that such evidence should be excluded because it had been in the possession of the People well before commencement of the trial and had been deliberately withheld in violation of a general discovery order[12]—that the evidence was admissible on rebuttal since there had been no specific request for the telephone number, required for compelled disclosure of unfavorable evidence (see *People* v. *Jackson* (1980) 28 Cal.3d 264, 308 [168 Cal.Rptr. 603, 618 P.2d 149]) and there had been no deliberate withholding of such evidence by the prosecution since it had only been discovered two days earlier.[13] Defendant now contends that the court committed prejudicial error, claiming that the phone record rebuttal evidence was material incriminating evidence in the prosecutor's possession well before trial which should have been excluded because it was not properly presented during the People's case-in-chief. (See *People* v. *Carter* (1957) 48 Cal.2d 737, 753-754 [312 P.2d 665].)

■ Defendant is mistaken. Section 1093, subdivision (d) limits the prosecution to rebutting testimony only after the defendant has offered his

he had a habit of billing to virtually any number he knew to avoid paying telephone charges; thereafter, on recross, he indicated on the record for the first time a new possible source for the billing: his mother's phone number.

[12] The general discovery order at issue required the People to furnish on a continuing basis "all relevant material now known to the [P]eople or which may become known, or which through reasonable efforts in good faith may be learned, which would assist the Defendant in preparation of the defense against the charges. . . . [Citations.]"

[13] The record shows that Popham never mentioned his mother as someone he might have billed the call to until questioned pointedly about this by the prosecutor during a private interview on November 28, 1980, after Popham had testified at the trial on direct examination. On December 1, 1980, Popham first mentioned this possibility on the record during recross, just before the People rested. Thereafter, investigation by the People of Mrs. Laudeman's records—Popham's mother—led to the discovery of an unfamiliar San Jose phone number for which telephone company records revealed that a 22-cent call was placed on November 3, 1980, to defendant's residence, just two days after the murders.

evidence, unless the court, for good reason, in furtherance of justice, permits it to offer evidence upon its original case. In *Carter, supra,* 48 Cal.2d 737, this court explained that the purpose of these restrictions was to (1) ensure the orderly presentation of evidence so that the trier of fact is not confused; (2) to prevent the prosecution from "unduly magnifying certain evidence by dramatically introducing it late in the trial;" and (3) to avoid "unfair surprise" to the defendant from sudden confrontation with an additional piece of crucial evidence. (*Id.* at p. 753.) Accordingly, we held that "proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt." (*Id.* at pp. 753-754.)

Thus, in *Carter, supra,* 48 Cal.2d 737, we disapproved of the prosecutorial tactic of intentionally withholding crucial evidence properly belonging in the case-in-chief to take unfair advantage of the defendant. (See *People* v. *Graham* (1978) 83 Cal.App.3d 736, 741 [149 Cal.Rptr. 6].) In the case at bar, however, the record clearly establishes that the evidence claimed as improper rebuttal was not in the prosecution's possession until after the close of the People's case-in-chief.[14] We cannot perceive any deliberate withholding of evidence by the prosecution to gain an unfair advantage; the prosecutor simply did not discover the complained-of evidence in time to present in her case-in-chief.[15]

---

[14] Defendant claims that the rebuttal evidence at issue was in the possession of the "prosecution" well in advance of defendant's trial. In support of this contention, he asserts that the San Jose telephone number was given to a Detective Cooper by Ron Curry—an apparent acquaintance of Popham's—in November 1979, approximately one year prior to defendant's trial and preceding Popham's arrest and the filing of charges against defendant. There is no reliable factual substantiation of this claim in the record. Although defense counsel related to the court hearsay statements of their investigator that Ron Curry told him (the investigator) that he had given the San Jose telephone number to a Detective Cooper prior to Popham's arrest, and an evidentiary hearing was informally requested, neither Ron Curry nor Detective Cooper ever testified as to their recollections on this issue, apparently because neither could be made available on December 3, 1980, when defense counsel indicated he wanted to conduct an evidentiary hearing. We note, however, that defendant did not thereafter formally request such a hearing, nor did he request a continuance to obtain the appearance of either Curry or Cooper or to submit any declarations from these witnesses to substantiate defendant's claim of prosecutorial suppression of evidence.

[15] Defendant alternatively argues—in reliance on *United States* v. *Aceves-Rosales* (9th Cir. 1987) 832 F.2d 1155—that there was *Carter* error because the People discovered the San Jose telephone number sometime during the defense case—on December 2—yet did not disclose this evidence until the next day, after the defense rested. Defendant's reliance on *Aceves-Rosales* is misplaced. In that case, the Ninth Circuit upheld exercise of a trial court's discretion to exclude evidence sought to be presented by the *defense* in violation of a federal criminal discovery rule (Fed. Rules Crim. Proc., rule 16(c); 18 U.S.C. § 1114) specifically requiring a party subject to reciprocal discovery to notify the opposing party of the existence of any newly discovered evidence. No such rule is involved in the case at bar, nor did *Aceves-Rosales*

Even had she discovered the evidence earlier, the telephone records were not "crucial" or "material" evidence which properly belonged only in the case-in-chief. Such evidence, by itself, did not tend to establish guilt (cf. *Carter, supra,* 48 Cal.2d at pp. 753-754); nor was it "directly probative of the crimes charged" (*People* v. *Thompson* (1980) 27 Cal.3d 303, 330-332 [165 Cal.Rptr. 289, 611 P.2d 883]) or relevant to the establishment of an element of the charged offense. (Cf. *People* v. *Katz* (1962) 207 Cal.App.2d 739, 747-751 [24 Cal.Rptr. 644].) Before defendant took the stand, the prosecutor could not have known whether defendant, assuming he even testified, would deny receiving a phone call from Popham within a few days after the murders; since Popham merely testified that defendant asked him to call back and did not testify to anything incriminating in the content of the call, it was conceivable that defendant might have admitted receiving such a call for an innocent purpose,[16] or that someone other than defendant or his friend Taylor answered the phone that day. The denials pertaining to the phone call therefore were not assertions implicit in defendant's denial of guilt or plea of not guilty. (Cf. *Carter, supra,* 48 Cal.2d at p. 754.) But once these denials were made part of the defense case, it was clearly proper rebuttal to introduce the telephone records to impeach defendant's credibility. (Cf. *People* v. *Miller* (1963) 211 Cal.App.2d 569, 575 [27 Cal.Rptr. 290].) Such impeachment evidence being proper rebuttal, it was immaterial that the evidence also supported the People's case by bolstering Popham's credibility, or might properly have been allowable as part of the prosecution's case-in-chief. (See, e.g., *People* v. *Wein* (1958) 50 Cal.2d 383 [326 P.2d 457]; *People* v. *Mackey* (1959) 171 Cal.App.2d 513, 516-517 [340 P.2d 688].)

Even if we assume there was error, it was not prejudicial. The admission of the telephone records at issue, while constituting effective impeachment, did not totally discredit defendant's credibility or that of his witnesses; the

---

involve a claim of improper prosecutorial rebuttal. We further note that there was no violation of any discovery order or suppression of material evidence in the instant case. The trial court properly found that there was no specific request for the San Jose number, and past cases show that absent such a request, the People are not compelled to disclose evidence that is unfavorable to the defense and is neither substantial nor material. (See *People* v. *Jackson, supra,* 28 Cal.3d 264, 308; *Evans* v. *Superior Court* (1974) 11 Cal.3d 617, 622 [114 Cal.Rptr. 121, 522 P.2d 681], and discussion, *post,* at pp. 1212-1213.) We further observe that the general discovery order (fn. 12, *ante,* at p. 1210) did not allude to the San Jose telephone number nor did it compel disclosure of potential rebuttal witnesses or impose on the People the duty to turn over to the defense impeachment evidence made necessary by defense cross-examination or the defense case.

In any event, our *Carter* decision was never intended to compel disclosure or exclusion of prosecutorial rehabilitative or impeachment evidence first discovered after close of the People's case-in-chief. We reject defendant's imaginative effort to deprive the People of their statutory perogative to present proper rebuttal to new evidence introduced by the defense.

[16] It was undisputed at trial, for example, that Popham spoke with defendant in person at defendant's work place immediately after the murders.

records merely showed that Popham indeed telephoned the residence, not that Popham actually spoke to either defendant or Steve Taylor.[17] Unlike past cases in which prejudice was found, the rebuttal evidence in issue did not strongly tend to establish guilt, as did the admission of a charged prior conviction (see *People* v. *Castro* (1960) 182 Cal.App.2d 255, 262-268 [5 Cal.Rptr. 906]), a defendant's incriminating statements to the police (see *People* v. *Robinson* (1960) 179 Cal.App.2d 624, 629-631 [4 Cal.Rptr. 50]), or evidence directly probative of an element of a charged offense (see *Katz, supra,* 207 Cal.App.2d 739, 749). Even the prosecutor's closing argument—which at one point referred to the phone records as being "important" because they tended to corroborate Popham's testimony that he contacted defendant after the murders to collect his fee—ultimately characterized the phone record evidence as one of the "minor little points" that corroborated Earlin Popham as a believable witness. It is not reasonably probable that a result more favorable to the defendant would have occurred in the absence of the error. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

5. *Sufficiency of the Evidence of Express Malice as to Baby Girl Bunyard*

Defendant further argues that there was insufficient evidence of express malice to support his conviction of first degree murder in connection with Baby Girl Bunyard. Our review of the record persuades us that there was substantial evidence of express malice to support this conviction.

■ When sufficiency of the evidence is challenged on appeal, the court must review the entire record in a light most favorable to the judgment to determine whether it contains substantial evidence from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574, 99 S.Ct. 2781]; *People* v. *Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110].) If the evidence reasonably justifies the finding of the trier of fact, the reviewing court's opinion that this evidence could also be reconciled with a contrary finding does not warrant a reversal of the judgment. (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649]; *People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

---

[17] The prosecutor did not suggest in closing argument that either defendant or other defense witnesses were lying when they testified that they did not receive a call from Popham. Rather, the prosecutor argued that all of the defense witnesses may have forgotten the phone call—or, in the case of Steve Taylor, may not have received the call—because of the passage of time and the confusion ongoing in the Bunyard household in the wake of the funeral preparations. Moreover, defense counsel's argument emphasized that the phone record evidence did not prove that Popham ever spoke with defendant, Steve Taylor, or Clarence Bunyard.

 A finding of first degree murder on a theory of premeditation and deliberation is proper only when the slayer killed as the result of careful thought and weighing of considerations, as a deliberate judgment or plan, carried on coolly and steadily, especially according to a preconceived design. (*People* v. *Anderson* (1968) 70 Cal.2d 15, 26 [73 Cal.Rptr. 550, 447 P.2d 942]; *People* v. *Rowland* (1982) 134 Cal.App.3d 1, 7 [184 Cal.Rptr. 346].) The type of evidence which sustains a finding of premeditation and deliberation falls into three categories, one of which is "planning" activity: facts prior to the killing which would show that the defendant was engaged in activity directed toward the killing, or had a preconceived design to take the victim's life. (*Anderson, supra,* 70 Cal.2d at pp. 26-27; *People* v. *Alcala* (1984) 36 Cal.3d 604, 625-626 [205 Cal.Rptr. 775, 685 P.2d 1126]; *Rowland, supra,* 134 Cal.App.3d 1, 7-8.)

 In response to defendant's claim, the Attorney General submits that (1) the same evidence that demonstrates defendant's deliberate and premeditated decision to kill Elaine also constituted sufficient evidence of his plan and intent to kill the baby she was carrying, (2) that defendant has not challenged the sufficiency of the evidence of intent to kill with respect to Elaine, and (3) that it is not possible that defendant, living with his nine-month pregnant wife at the time, could have intended to kill only her, and not have intended to kill the baby as well. We agree with the Attorney General that the record shows substantial evidence of specific intent to kill Baby Girl Bunyard, i.e., express malice.

Popham's testimony established that defendant's murder plan was that his pregnant wife should die by means of a close-range shotgun blast to simulate a "suicide." The record also shows that defendant conceived of this plan knowing that his wife was pregnant and that he provided the shotgun. Additionally, Popham's testimony established that defendant continued to urge Popham to carry out the murder plan as the baby's birth drew nearer, and agreed to Popham's choice of November 1 as the date knowing that Elaine was due to deliver at any time. In sum, there seems to be more than substantial evidence supporting the conviction of defendant for the first degree murder of Baby Girl Bunyard; indeed, it is inconceivable that defendant intended to kill Elaine and not her unborn child under the facts of this case.

## B. *Ineffective Assistance of Counsel*

 Defendant next argues that trial counsel was inadequate for failing to object to portions of two letters which Elaine wrote—one to Sarah Pender, and one to defendant—which were read to the jury just before the prosecution called Sarah Pender as a witness. Defendant complains that the

letters as a whole were inadmissible, particularly those portions commenting unfavorably on his credibility and character, and that defense counsel's apparent tactical reason for not objecting to the letters fell outside the range of reasonable competence and prejudiced the defense, requiring reversal.

To establish ineffective assistance of counsel, a convicted defendant must show that his counsel's representation was deficient, i.e., "fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 2052]; accord, *People* v. *Ledesma* (1987) 43 Cal.3d 171, 216 [233 Cal.Rptr. 404, 729 P.2d 839].) Where the record shows that the omission or error resulted from an informed tactical choice within the range of reasonable competence, we have held that the conviction should be affirmed. (*People* v. *Pope* (1979) 23 Cal.3d 412, 424-426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

As our high court in *Strickland* stated, "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a *strong presumption* that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action *'might be considered sound trial strategy.'*" (466 U.S. at p. 689 [80 L.Ed.2d at pp. 694-695], italics added; accord, *Kimmelman* v. *Morrison* (1986) 477 U.S. 365, 383 [91 L.Ed 2d 305, 325, 106 S.Ct. 2574].)

We emphasized in *Ledesma,* however, and reiterate here, that deference is not abdication, and "[deference] must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions." (*Ledesma, supra,* 43 Cal.3d at p. 217.)

Defendant is correct in his assertion that the letters at issue contain specific instances of past lies by defendant, as well as general statements indicative of bad character. Elaine refers to defendant in her letters as "evil" and "tricky" and describes defendant's behavior as duplicitous and hurtful in his behavior towards her, Sarah Pender, and other loved ones. We also agree with defendant that the letters were offered for the truth of what they

stated and were hearsay, and any conceivable nonhearsay purpose may well have been outweighed by the prejudicial effect warranting exclusion under Evidence Code section 352 had defendant so requested. Additionally, trial counsel could have properly objected to the admissibility of the letters, or portions thereof, as inadmissible character evidence, given the fact that defendant never introduced evidence of good character. (See, e.g., Evid. Code, §§ 787, 1102; *People* v. *Anderson* (1978) 20 Cal.3d 647, 649-650 [143 Cal.Rptr. 883, 574 P.2d 1235]; *People* v. *Wagner* (1975) 13 Cal.3d 612, 618-620 [119 Cal.Rptr. 457, 532 P.2d 105]; *People* v. *Terry* (1970) 2 Cal.3d 362, 399-400 [85 Cal.Rptr. 409, 466 P.2d 961].)

In the instant case, trial counsel not only failed to object to admission of any part of Elaine's letters, but in fact stipulated to their admission. Although there was no discussion on the record regarding the letters' admissibility or defense counsel's possible tactical reasons for not objecting to them, a strong indication of defense counsel's reasoning appears in closing argument to the jury. He told the jurors that if the prosecutor had not read the letters to them, he would have done so himself because the letters showed "absolutely" no reason or motive for defendant to kill his wife. Defense counsel further argued that even though defendant was a "louse" (defense counsel's words), the letters showed that there "obviously was something good in Jerry Bunyard" since Elaine still loved him and considered him the "best friend she ever had" despite knowing of his affair with Sarah Pender and his penchant for lying, and that defendant would have no reason to kill Elaine since defendant "never would find another woman like Elaine who would openly allow him to have his two women."

Defendant derides trial counsel's tactical choice as bizarre, unreasonable and incompetent, claiming that the letters provided no assistance to his case but rather only prejudiced the jury against him by portraying him as a "louse" and a liar. Defendant claims this was particularly prejudicial where, as here, the defense hinged heavily on the jury's assessment of the defendant's credibility. The Attorney General contends that while the letters arguably diminished defendant's image by revealing him to be a selfish, two-timing cad, the jury received that picture of defendant from other evidence in the case as well, and the letters assisted the defense in dispelling two plausible motives for murder: freedom from an angry, unforgiving wife, and suspicion that the defendant was not the baby's father.[18]

---

[18] Without the letters, the Attorney General argues the jury might have reasoned that Elaine threatened defendant, or otherwise caused him more grief than he could abide, so that he killed her. The letters showed the jury that while Elaine was hurt, she could forgive and wanted him back, and that defendant, from his selfish point of view, had succeeded in obtaining the best of both worlds—openly keeping a mistress while maintaining intimate relations with a loving and faithful wife—and therefore had no reason or motive to kill Elaine. The

The letters do portray defendant in a particularly damaging light. Defendant is described as a callous, self-centered chronic liar who openly cheated on his loyal and forgiving wife, manipulated her to cover his lies to Sarah Pender, and regularly hurt, used and lied to people to obtain his goals. It is difficult to see how the jury could have reacted favorably to defendant as a witness, after listening to these telling words from the grave. We are unwilling, however, to second-guess the informed tactical decision of trial counsel to stipulate to the admission of these letters. Admission of the letters might have been sound trial strategy in the sense argued by the Attorney General—that they tended to nullify two plausible motives to kill—in a case where motive was definitely a prominent issue, and lack of motive to kill was a major aspect of the defense case.

Additionally, as the Attorney General notes, even without the letters the defense at trial was faced with defendant's image as a "louse" and liar—which had to be dealt with in some effective manner. From Sarah Pender, the jury would necessarily have become aware of defendant's capacity for deceit. Her testimony established that defendant was less than candid about his marital status, first implying he was single by saying he was living with his father, subsequently giving the impression he was married but separated, and then telling Sarah that he had filed for divorce when in fact he had not. In addition to defendant's blatant two-timing of his pregnant wife, defendant's physical abuse of Elaine, manifest from several sources, also demonstrated his lack of good character. Admission of the letters enabled trial counsel in closing to argue that despite these severe character flaws, defendant did not have any reason or motive to kill his wife or unborn child since this "good woman" loved and forgave him and he fathered the child she was carrying. Although certainly fraught with considerable risk to defendant's credibility, we cannot say that trial counsel's tactical decision fell outside the wide range of reasonable professional assistance. Hence, defendant's conviction may not be reversed for ineffective assistance of counsel.

## C. *Denial of Requests to Sequester Jury*

On three separate occasions—during voir dire, the People's case-in-chief, and just prior to submission of the case to the jury—defendant requested sequestration of the jury to protect against improper influence due to media

---

letters also tended to remove a second possible motive, i.e., that defendant had killed his wife because she was pregnant with another man's child, a motive raised by Popham's testimony. Popham had testified that defendant had told him that the baby was not his. In the letter to her husband, Elaine emphatically declared her loyalty to her husband; similarly, in her letter to Sarah Pender, Elaine declared that the baby she was carrying was defendant's, and that it was a planned pregnancy. In sum, the Attorney General argues the letters constituted powerful evidence that defendant had no reason to kill his wife or baby and that therefore, inferentially, Popham must have been acting on his own.

publicity. The court denied all the requests, but strongly admonished the jury to avoid reading, watching, or listening to all news accounts of the case.[19] Defendant complains that the trial court's denial of his requests to sequester the jury constituted prejudicial error.

Statutes and past cases indicate that sequestration is discretionary with the trial court even in capital cases (See §§ 1121, 1128; *People* v. *Ruiz, supra,* 44 Cal.3d at pp. 615-617; *People* v. *Burwell* (1955) 44 Cal.2d 16, 33 [279 P.2d 744]; *People* v. *Erno* (1925) 195 Cal. 272, 282 [232 P. 710].) Defendant does not argue that there were any special problems in this case that rendered the trial court's denial of his sequestration requests an abuse of discretion, but asserts that in light of the nature of capital cases we should interpret the relevant statutes to require sequestration on request in all capital cases.

Defendant points out that 17 states have statutes or judicial rules which require sequestration of the jury throughout the trial in a capital case upon request, and that 13 additional states require sequestration during deliberations. Defendant particularly relies on Indiana decisions which have adopted the rule defendant proposes—mandatory sequestration on request in capital cases—in conjunction with a discretionary statute similar to section 1121.[20] (See *Lowery* v. *State* (Ind. 1982) 434 N.E.2d 868, 870; *Smith* v. *State, supra,* 475 N.E.2d 1139, 1143.)

---

[19] The first sequestration request was made after defense counsel had noticed a news article about a similar murder case. Counsel's request was expressed in the alternative—either that the jury be sequestered or that the trial judge speak to the newspaper reporter and urge her not to publish any more stories that related in any way to defendant's trial. The court chose the latter course.

The second request came during the People's case. Defense counsel apparently saw a news story which purportedly referred to evidence which had been excluded or stricken from the record. While refusing to sequester the jury, the court examined each juror individually to determine if anyone had read the news story. The record shows that none of the jurors had read the story. Following this examination, the court denied defendant's motion for a mistrial, and defense counsel—stating for the record his belief that most, if not all of the jurors had probably been truthful in responding that they had not seen the news story—simply requested that the court again strongly admonish them to avoid reading any articles about the trial. The court did so, explaining—pursuant to counsel's request—the potential dangers of prejudice to defendant resulting from media exposure.

Defendant also requested the court to sequester the jury during deliberations at the consolidated guilt and special circumstances phase. The court again refused the request, observing that the jury had conscientiously complied with the court's admonitions not to read, view, or listen to any news accounts of the case, and noting that nothing out of the ordinary had occurred. The court then informed the jury they would not be sequestered during deliberations and again admonished them.

[20] Section 1121 provides, in pertinent part: "The jurors sworn to try an action may, in the discretion of the court, be permitted to separate or be kept in charge of a proper officer. Where the jurors are permitted to separate, the court shall properly admonish them." Indiana Code section 35-1-37-2 (Pub. Law 1905, ch. 169, § 263, p. 584) provides: "When the

Defendant's analogy to Indiana law appears inapposite. As pointed out by the Attorney General, the mandatory sequestration rule adopted by the Indiana Supreme Court in *Lowery, supra,* 434 N.E.2d 868, was based upon longstanding common law principles which had existed in that state well before any statute addressed the subject of jury separation. In this state, however, the cases have long interpreted the relevant statutes to vest discretion in the trial court to permit the jury to separate in capital and noncapital cases alike. (See, e.g., *People* v. *Chaves* (1898) 122 Cal. 134, 139-140 [54 P. 596]; *People* v. *Witt* (1915) 170 Cal. 104, 109 [148 P. 928]; *People* v. *Erno, supra,* 195 Cal. 272, 282-283; *People* v. *Burwell, supra,* 44 Cal.2d 16, 33.) Moreover, the Legislature has not modified sections 1121 and 1128 to signal its disapproval of this court's interpretation. Thus, reconstruction of our jury separation and sequestration statutes to adopt the Indiana rule in capital cases would be inconsistent with California common law and legislative intent.

Additionally, it is clearly the Legislature's prerogative to enact trial procedures such as are embodied in sections 1121 and 1128, and, once it has done so, neither this nor any court may substitute its judgment for that of the Legislature, in the absence of a constitutional violation. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 463 [194 Cal.Rptr. 390, 668 P.2d 697]; *Estate of Horman* (1971) 5 Cal.3d 62, 77 [485 P.2d 785].) Although defendant contends that sequestration of the jury in capital cases is a constitutional right, i.e., required by the due process clause of the Fourteenth Amendment, he cites no express authority for that proposition.[21] Moreover, defendant does not even attempt to show he was prejudiced by denial of his requests to sequester the jury. As stated by our high court in *Estes* v. *Texas* (1965) 381 U.S. 532 at page 542 [14 L.Ed.2d 543, 550, 85 S.Ct. 1628], on which defendant relies: "[I]n most cases involving claims of due process deprivations . . . a showing of identifiable prejudice to the accused" is required. . . ." The record simply cannot support such a showing and

jurors are permitted to separate, after being impaneled, and at each adjournment, they must be admonished by the court that it is their duty not to converse among themselves, nor suffer others to converse with them, on any subject connected with the trial, or to form or express any opinion thereon, until the cause is finally submitted to them."

In 1982, the foregoing Indiana statute was repealed and was replaced by Indiana Code section 35-37-2-4, which, in addition to requiring admonishment when the jury separated, provided in pertinent part: "(b) The jurors may separate when court is adjourned for the day, unless the court finds that the jurors should be sequestered in order to assure a fair trial." [Ind. Code 35-37-2-4, as added by Acts 1981, Pub. Law 298, § 6.] The new statute has also been construed to require sequestration in capital cases. (*Smith* v. *State* (Ind. 1985) 475 N.E.2d 1139, 1143.)

[21] The federal courts which have addressed this issue have refused to recognize any federal constitutional right to have the jury sequestered. (See, e.g., *Powell* v. *Spalding* (9th Cir. 1982) 679 F.2d 163, 166, fn. 3; *Young* v. *State of Alabama* (5th Cir. 1971) 443 F.2d 854, 856, cert. den. 405 U.S. 976 (1972) [31 L.Ed.2d 251, 92 S.Ct. 1202].)

defense counsel admitted at trial that there was no indication that the jurors had violated the court's numerous and strenuous admonitions against reading, watching or listening to anything publicized about the case.[22]

Defendant nonetheless urges us to find "inherent prejudice," i.e., that the procedure of discretionary sequestration in capital cases "involves such a probability that prejudice will result that it is deemed inherently lacking in due process." (*Estes, supra,* 381 U.S. at pp. 542-543 [14 L.Ed.2d at p. 550].) Unlike *Estes,* in the case at bar there was no televising of the trial, or disruption of proper courtroom decorum by news media. (Cf. *Estes, supra,* 381 U.S. at p. 544 [14 L.Ed.2d at p. 551].) In the absence of such disruptive influences, we reject defendant's contention that discretionary sequestration accompanied by frequent admonishment of the jury to avoid media exposure is a procedure inherently lacking in due process. We hold that prejudice will not be presumed in such circumstances.

D. *Prosecutorial Comment on Excluded Evidence*

Defendant next contends that the court erred by allowing the prosecutor to refer, in argument, to a portion of a statement of defendant ruled inadmissible under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Even if we assume that the trial court erred in this respect, any error was not prejudicial.

One of the proposed prosecution witnesses was Sergeant Johnson, who was present when defendant made a statement to several sheriff's deputies on November 1, 1979. Before Johnson was actually called to the stand, defendant moved to exclude all statements made by defendant on November 1 on the ground that defendant had not been given a *Miranda* admonition nor had waived his *Miranda* rights. The trial court scheduled a hearing on the motion, and Sergeant Johnson did not immediately take the stand.

Thereafter, before the trial court had ruled on the *Miranda* issue, Sarah Pender testified on behalf of the prosecution that she had been introduced to Popham as Earlin Laudeman, and that she had remembered or realized this fact when she overheard defendant give the name "Laudeman" to deputies on November 1, the day of the murders. At that point, defendant did not object to Pender's testimony on any ground, and, in particular, did not

---

[22] The Attorney General additionally points out that the jurors did not ever separate during its guilt phase deliberations. The matter was submitted to them at about 10:45 a.m., on December 8, 1980, they were kept together for the purpose of eating lunch in the courtroom, and then resumed deliberations after lunch, returning their verdict the same day about 4:45 p.m.

claim that Pender's reference to defendant's November 1 statement was an impermissible "fruit" of an alleged *Miranda* violation.

Later in the trial, after holding a hearing on the *Miranda* question, the trial court concluded that defendant's November 1 statements to Sergeant Johnson were inadmissible under *Miranda*. Thereafter, at the conclusion of the trial but before argument, defense counsel sought to preclude the prosecutor from referring to the portion of Pender's testimony in which she referred to defendant's November 1 statement. In arguing that motion, both the prosecutor and defense counsel erroneously indicated that defendant's motion to exclude the November 1 statements had been made *after* Pender had testified; in fact, the motion had preceded the testimony but the trial court's ruling on the motion had come after the testimony. The trial court, in apparent reliance on counsel's erroneous recollection, denied defendant's motion to preclude prosecutorial argument on this evidence. As noted, defendant now claims that the trial court erred in failing to limit the prosecutor's argument.

Where there is a violation of defendant's Fifth Amendment rights under *Miranda,* the statements of the accused and any "fruits" thereof are inadmissible. (*People* v. *Braeseke* (1979) 25 Cal.3d 691, 703 [159 Cal.Rptr. 684, 602 P.2d 384].) Although the record clearly shows that defendant had moved to exclude his November 1 statements as inadmissible under *Miranda* prior to Sarah Pender's testimony, defense counsel failed to object to a "fruit" of that inadmissible statement—Sarah Pender's overhearing of defendant's reference to Popham as "Laudeman" at the sheriff's office on November 1, 1979. Any claim of error may therefore be deemed waived. (Evid. Code, § 353; *People* v. *Rogers, supra,* 21 Cal.3d at p. 548.)

Even if this claim has not been waived, it is not entirely clear that the court erred in permitting the prosecutor to comment on Sarah Pender's testimony which referred to the November 1 statements. Defense counsel made no motion to strike the relevant portion of Pender's testimony and thus the evidence about which defendant now complains was still in evidence, and arguably could be the subject of appropriate comment by the prosecutor.

In any event, assuming that the court did err in denying defendant's motion to bar prosecutorial comment on this evidence, we conclude that the error was harmless. The prosecutor did not use the statement to suggest that defendant was evasive or manipulative towards the sheriff's deputies, but argued that defendant's evasiveness about Popham's name reflected defendant's lack of candor, manipulation, and dishonesty towards Sarah Pender. As pointed out by the Attorney General, however, the inference of

evasiveness towards Sarah Pender on this point was quite weak. Since defendant testified that he had consistently referred to Popham since childhood as Laudeman, and Popham himself testified that he used the name Laudeman until he entered military service, defendant's introduction of Sarah Pender to Earlin Popham as Earlin Laudeman and defendant's reference to Popham as Laudeman in Pender's presence at the sheriff's office does not evince evasiveness or deceit. We conclude that the People have shown beyond a reasonable doubt that the alleged error did not contribute to the verdict. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 756 [175 Cal.Rptr. 738, 631 P.2d 446].)

### E. *Prosecutorial Misconduct*

 Defendant next complains that the prosecutor committed misconduct by arguing that defendant was an "interested party" and that the jury should consider his interest and motive to lie when assessing his credibility.[23] By analogy to early cases holding that the court in its instructions may not single out and specifically instruct on the defendant's interest because this throws the court's judicial weight into the scales against the defendant (see, e.g., *People* v. *Maughs* (1906) 149 Cal. 253, 262-263 [86 P. 187]) defendant reasons that prosecutorial argument which singles out the defendant's interest and motive to lie carries comparable weight and is misconduct warranting reversal.

Defendant cites as misconduct that which the prosecutor was entitled to do. In *People* v. *Jenkins* (1974) 40 Cal.App.3d 1054 at pages 1057-1058 [115 Cal.Rptr. 622], comments concerning defendant's bias and motive to lie were deemed proper because such comments were fairly derived from the evidence. In *Jenkins,* the prosecution established that Jenkins had voluntarily given a statement to the police prior to trial, in which he never mentioned that the victim had purportedly pulled a knife on him before Jenkins killed him. Here, defendant denied that he ever offered to pay either Popham or Johnson to kill his wife despite the testimony of each to the contrary. In so doing, defendant placed his denial directly in issue. That denial, like Jenkins's failure to mention the knife, "was ground for comment." (*Id.*

---

[23] The portion of the prosecutor's argument claimed as misconduct is as follows: "[*I*]*t's obvious that the person who has the most motive to come in and lie to you in the in the courtroom, ladies and gentlemen, is the defendant, Jerry Bunyard.* And that is one of the things, one of the guides to credibility of a witness that you have to use. What is the person's position in testifying? What interest do they have in the outcome of the trial? Obviously, a neutral witness like Kerry Griffiths, Kerry has no real interest in the outcome of this trial. He says, 'I saw somebody come out of the house at 10 o'clock with a wet head.' There is not much reason to disbelieve him unless you find that he was perhaps in a position where he could not have seen that or where he is having a failure of recollection. But he has no motive to lie to you, particularly. *He is not an interested party.* [¶] *Jerry Bunyard is.*" (Italics added.)

at p. 1058; see also Evid. Code, § 780, subd. (f) and CALJIC No. 2.20 (1980 rev.).)

Defendant further argues that just as a prosecutor is precluded from exploiting defendant's decision to defend by *not* taking the stand (*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]), a prosecutor should not be allowed any advantage in argument—and defendant should not start with the substantial strike against him that all of his testimony is inherently suspect—simply because the defendant has chosen to defend *by taking* the stand. As pointed out by the Attorney General, however, defendant's argument ignores the fact that the direct conflict between his testimony and that of the assassin he hired placed each of their respective biases, interests, and motives in issue. Since defendant was clearly "a person who testified under oath," defendant was a "witness" and the jury was free to "consider anything in reason that tended to prove or disprove the truthfulness of his testimony, including the existence or nonexistence of a bias, interest or other motive. . . ." (See Evid. Code, § 780, subd. (f) and CALJIC No. 2.20.) Thus, it was appropriate for the prosecutor to argue that the jury could consider whether defendant had a motive to lie about hiring Popham, arising from his interest in the outcome, i.e., to avoid conviction, just as it was appropriate for defense counsel to argue that Popham lied in exchange for the government's promise not to seek the death penalty against him.

Moreover, the prosecutor never suggested that the jury should look at defendant's status as a party or at his interest in the outcome as the sole determinant of his credibility. In briefly referring to defendant as an "interested party," the prosecutor significantly characterized this status as "*one* of the things, *one* of the guides to credibility of a witness that you have to use." (Italics added.) The remainder of her argument emphasized other factors traditionally bearing on credibility, such as defendant's lies, inconsistent statements, admissions of untruthfulness, demeanor, and the character and quality of his testimony as contrasted with the demeanor of prosecution witnesses and quality of their testimony. (See CALJIC No. 2.20.).

Defendant also unpersuasively argues that the prosecutor's comments violate his federal due process rights under *Sandstrom* v. *Montana* (1979) 442 U.S. 510, 523-524 [61 L.Ed.2d 39, 50-51, 99 S.Ct. 2450]. He asserts that the prosecutor's emphasis on defendant being an "interested party" created a "presumption of guilt" and a presumption of interest and bias based solely on defendant's status as defendant and on his interest in acquittal, which conflicts with the presumption of innocence thereby lessening the People's burden of proof. We find no merit in defendant's position. The jury in the case at bar was not instructed by the court that there was any presumption

of interest and bias; to the contrary, the instruction upon which the prosecutor (CALJIC No. 2.20) based her argument relating to credibility clearly left the jurors a choice as to whether to find any existence of motive or interest on the part of any witness, including defendant. Nor does the record show any argument from the prosecutor that the jury should presume guilt as the result of his status as the defendant or his interest in acquittal. We perceive no violation of due process under the facts presented.

### F. Asserted Instructional Errors

#### 1. Oral Admissions

■ Defendant argues that the court erred in failing to sua sponte instruct jurors, pursuant to CALJIC Nos. 2.71 and 2.71.7, that evidence of oral admissions and statements should be viewed with caution. Both Popham and Johnson testified concerning statements allegedly made by defendant to each of them soliciting them to kill Elaine in return for considerable sums of money. While conceding that defendant's solicitations of both Popham and Johnson could be viewed as admissions, the Attorney General nonetheless argues that no error occurred because the purpose behind these cautionary instructions—to warn the jury about possible flaws in the accuracy and meaning of a witness's testimony, not the truthfulness of the witness—had no applicability where the true issue was one of credibility, i.e., did defendant solicit Popham and Johnson to kill his wife at all, rather than the precise words used by defendant, or whether Popham or Johnson remembered or reported them accurately.

The Attorney General's arguments are convincing on the issue of prejudice, but not as to error. In *People* v. *Beagle* (1972) 6 Cal.3d 441 at page 455 [99 Cal.Rptr. 313, 492 P.2d 1], we held the court must instruct sua sponte that "evidence of oral admissions must be viewed with caution . . . ." Under *Beagle,* the court's failure to so instruct was error.

The error, however, was not prejudicial. As we explained in *Beagle,* "The omission . . . does not constitute reversible error if upon a reweighing of the evidence it does not appear reasonably probable that a result more favorable to defendant would have been reached in the absence of the error." (6 Cal.3d at p. 455.) We agree with the Attorney General that there was no issue of conflicting evidence in this case concerning the precise words used, their meaning or context, or whether the oral admissions were remembered and repeated accurately. (Cf. *People* v. *Bemis* (1949) 33 Cal.2d 395 [202 P.2d 82]). Defendant simply denied soliciting Popham or Johnson to kill his wife. At issue was whether Popham or Johnson were credible witnesses or had fabricated their testimony concerning defendant's solicita-

tions. The jury was properly instructed to view Popham's testimony, as an accomplice, with distrust (CALJIC No. 2.18), that Johnson's prior felony conviction could be considered in weighing his credibility (CALJIC No. 2.23), and that prior inconsistent statements, inconsistent testimony, feigned loss of memory, and wilfully false testimony would all bear on credibility (CALJIC Nos. 2.13 and 2.21). These instructions adequately alerted the jury to view the testimony of Johnson and Popham with caution. We believe that a more favorable result was not reasonably probable absent the error.

### 2. *"Other-crimes" Evidence*

Defendant contends that the court erred by failing to instruct sua sponte on the limited admissibility of Johnson's testimony concerning defendant's offers to pay him to kill Elaine. Defendant argues that such testimony constituted evidence of prior criminal conduct, i.e., solicitation to commit murder (§ 653f, subd. (b)), and that the court should have instructed the jury pursuant to CALJIC No. 2.50 that such evidence was admitted solely for the limited purposes of corroborating Popham's testimony and proving that defendant had undertaken a plan to hire someone to kill his wife, and not to prove a general criminal disposition.

In *People v. Collie* (1981) 30 Cal.3d 43 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776], we concluded that generally the trial court is under no duty to instruct sua sponte on the limited admissibility of evidence of past criminal conduct. We fashioned a limited hypothetical exception to the general rule, which we found inapplicable to *Collie* itself, for the "occasional extraordinary case in which protested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose. In such a setting, the evidence might be so obviously important to the case that sua sponte instruction would be needed to protect the defendant from his counsel's inadvertence." (*Id.* at p. 64.)

Contrary to defendant's claims, the case at bar does not present such an extraordinary case.[24] We agree with the Attorney General that Johnson's

---

[24] In arguing that the instant case is an "extraordinary case" under *Collie*, defendant relies on *People v. Willoughby* (1985) 164 Cal.App.3d 1054 [210 Cal.Rptr. 880]. Defendant's reliance on *Willoughby* is misplaced. Unlike the instant case, *Willoughby* involved evidence of unrelated and uncharged sexual crimes perpetrated against a different victim which potentially invoked the danger that absent a limiting instruction the jury would consider the evidence for the improper purpose of general propensity to molest children, as distinguished from sexual passion towards a particular individual. Moreover, the other-crimes evidence in *Willoughby* was found by the Court of Appeal to be the "focal point" of the prosecution's case; indeed, the trial court concluded that if it erred in admitting the evidence, the case

testimony was so highly relevant to the central issue, i.e., whether defendant had hired Popham to kill his wife and her unborn child or whether Popham was acting on his own, that there was little, if any, danger that the jury would consider such evidence for any of the improper purposes proposed by defendant, including general criminal disposition. Thus, Johnson's testimony was highly relevant and minimally prejudicial, the converse of the extraordinary case postulated in *Collie.*

Defendant argues that even if the court did not err when it failed to instruct the jury sua sponte on the limited admissibility of defendant's solicitations of Johnson, trial counsel was inadequate for failing to request such an instruction. As we have already explained, however, even if CALJIC No. 2.50 had been given, it is not reasonably probable that a result more favorable to defendant would have resulted, since the likelihood of the jury's using the evidence for an improper purpose was so minimal under the facts of this case that any conceivable error was harmless. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.) Thus, defendant's ineffective-assistance claim is without merit. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].)

### 3. *Beeman Error*

 Defendant contends that the judgment must be reversed because the jury was given the same aiding and abetting instructions[25] found erroneous in *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318] and *People* v. *Caldwell* (1984) 36 Cal.3d 210 [203 Cal.Rptr. 433, 681 P.2d 274], and was therefore not instructed to find that defendant acted with his own criminal "intent or purpose either of committing, or of encouraging or facilitating commission of, the offense," (*Beeman, supra,* 35 Cal.3d at p. 560) in addition to having knowledge of the actual perpetrator's purpose. The Attorney General concedes the error but asserts that it was

---

would have to be reversed. Although defendant's solicitations of Johnson in the instant case were significant to the prosecution's case, they were not a "dominant" part thereof. (Cf. *People* v. *Tucciarone* (1982) 137 Cal.App.3d 701, 708 [187 Cal.Rptr. 159].) Finally, the prior-crimes evidence in *Willoughby* was admitted for a purpose not relevant to a disputed issue. Thus, the other-crimes evidence in *Willoughby* was potentially highly prejudicial as distinguished from the case at bar.

[25] CALJIC No 3.00 (1979 rev.) defined principals to include "(1) Those who directly and actively commit the act constituting the crime, or (2) those who, with knowledge of the unlawful purpose of the one who does directly and actively commit the crime, aid and abet in its commission, or (3) those who, whether present or not at the commission of the crime, advise and encourage its commission."

CALJIC No. 3.01 (1979 rev.) defined aiding and abetting as follows: "A person aids and abets the commission of a crime, if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime."

harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

This court has recently held in light of the United States Supreme Court's decisions in *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101] and *Pope* v. *Illinois* (1987) 481 U.S. 497 [95 L.Ed.2d 439, 107 S.Ct. 1918], that a reversal-per-se standard of review for *Beeman* error, *supra,* 35 Cal.3d 547, is no longer appropriate, and that the *Chapman* test is the proper standard. (*People* v. *Dyer* (1988) 45 Cal.3d 26, 59-65 [246 Cal.Rptr. 209, 753 P.2d 1].) Applying that test, the record shows beyond a reasonable doubt that the *Beeman* error could not have affected the verdict.[26]

The jury was properly instructed that it had to find defendant guilty of all elements of the charged first degree murder offenses beyond a reasonable doubt, including that defendant must have acted with specific intent to unlawfully kill a human being or fetus (CALJIC No. 3.31). Additionally, the jury was instructed that to convict defendant of first degree murder, it must find an intentional, deliberate, and premeditated killing (CALJIC No. 8.20).

Having rejected defendant's claim of complete noninvolvement and alibi, the jury necessarily found that defendant not only acted with the requisite knowlege of Popham's purpose, but also with the intent to encourage or facilitate the murders of his wife and Baby Girl Bunyard. The record of this case suggests no rational basis upon which the jury could have found that the defendant aided the commission of the murders other than with the requisite intent required under *Beeman, supra,* 35 Cal.3d 547. Indeed under the theory of the case which the jury necessarily accepted, the killings only happened because defendant intended the killings and then hired Popham to commit them. There was no evidence presented suggesting accidental or unintentional aiding of the commission of the murders, nor were there any facts tending to show that defendant knew of Popham's criminal purpose but did not share it. Furthermore, neither counsel's closing arguments

---

[26]Defendant's reliance on language in prior cases (e.g., *People* v. *Garcia* (1984) 36 Cal.3d 539, 541, fn. 7 [205 Cal.Rptr. 265, 684 P.2d 826]; *Cabana* v. *Bullock* (1986) 474 U.S. 376, 384 [88 L.Ed.2d 704, 715, 106 S.Ct. 689]), suggesting that instructional errors affecting an element of an offense would be reversible per se because violative of the federal due process right to have the jury determine the elements, is misplaced. (Compare *Cabana* v. *Bullock* (1986) 474 U.S. 376, 384 ["Findings made by a judge cannot cure deficiencies in the jury's finding as to the guilt or innocence of a defendant resulting from the court's failure to instruct it to find an element of the crime"] with *Pope* v. *Illinois, supra,* 481 U.S. 497, 503-504, fn. 7 [95 L.Ed.2d 439, 447, 107 S.Ct. 1918, 1922] ["To the extent that cases prior to *Rose* may indicate that a conviction can never stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof, see, e.g., *Cabana* v. *Bullock* (1986) 474 U.S. 386, 384, after *Rose,* they are no longer good authority."].)

raised any issue regarding defendant's intent to kill as distinct from defendant's knowledge. Defense counsel's closing argument emphasized that Popham was lying to save himself from a death sentence, Johnson was not credible either, and defendant had no knowledge, motive, or intent to kill his pregnant wife or her unborn child; the prosecutor conversely argued that defendant instigated and planned the murders, hiring Popham to carry them out.

In sum, we conclude that on this record, the jury's finding of the predicate facts of knowledge of the perpetrator's criminal purpose conclusively established the requisite intent. Accordingly, the error was harmless beyond a reasonable doubt.[27]

### 4. Accomplice Instructions

 The court gave the jury accomplice instructions as a consequence of Popham's testimony for the prosecution. In particular, the court instructed the jury that the testimony of an accomplice needs corroboration. (CALJIC No. 3.11.)[28] The court also gave CALJIC No. 2.27 which allows the jury to find any fact based solely on the testimony of a single witness.[29] Defendant complains that the court erred because it did not instruct the jury that the testimony of Popham was not alone sufficient for the proof of any fact, and that the conflict between the foregoing instructions caused confusion which requires reversal.

Defendant's argument has been previously rejected by this court. (See *People* v. *Chavez* (1985) 39 Cal.3d 823, 829-832 [218 Cal.Rptr. 49, 705 P.2d

---

[27] We further conclude that reversal is not required under the California Constitution since it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. (See *People* v. *Odle* (1988) 45 Cal.3d 386, 415 [247 Cal.Rptr. 137, 754 P.2d 184].) We agree with defendant that this state has long recognized a defendant's right to have the jury determine every material issue presented by the evidence. (*People* v. *Modesto* (1963) 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33].) However, in *People* v. *Murtishaw, supra,* 29 Cal.3d 733, 765, we applied a harmless-error analysis to erroneous instructions that failed to require the jury to find intent to kill as an element of attempted murder. The test of prejudice we applied in *Murtishaw* was the *Watson* test, which this court long ago held "conforms to and satisfies the command of article VI, section 13, of the California Constitution that "[n]o judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

[28] CALJIC No. 3.11 states. "A defendant cannot be found guilty based upon the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such defendant with the commission of the offense."

[29] CALJIC No. 2.27 (1977 rev.) provides: "Testimony which you believe given by one witness is sufficient for the proof of any fact. However, before finding any fact [required to be established by the prosecution] to be proved solely by the testimony of such a single witness, you should carefully review all the testimony upon which the proof of such fact depends."

372].) We determined in *Chavez* that we must look to all of the instructions, rather than merely one part, to determine whether error occurred. (*Id.* at p. 830.) As in the case at bar, not only was CALJIC No. 3.11 given, but the jury was "further instructed [pursuant to CALJIC Nos. 3.12 and 3.18] as to the kind of evidence necessary to constitute corroboration, the method of determining whether the accomplice's testimony was corroborated, and that an accomplice's testimony should be viewed with distrust." (*Id.* at p. 831.)[30] Looking to these instructions as a whole, and to the fact that the closing arguments did not mislead the jury as to the need for corroboration, we found that "the jury was properly instructed on the proper standard of evaluating [an accomplice's] testimony." (*Id.* at p. 831.) Accordingly, we found no error nor prejudice in the giving of CALJIC No. 2.27 in conjunction with the foregoing accomplice instructions. Although we agreed with the Court of Appeal's suggestion in *People* v. *Stewart* (1983) 145 Cal.App.3d 967 [193 Cal.Rptr. 799] that CALJIC No. 2.27 should be modified to contain an explicit reference to testimony requiring corroboration, we did not hold that the absence of such a modification resulted in error per se. (*People* v. *Chavez, supra,* 39 Cal.3d at pp. 831-832.)

In the case at bar, there were additional accomplice instructions given which removed virtually all ambiguity about the need for corroboration of Popham's testimony. Unlike in *Chavez,* the court gave CALJIC Nos. 3.10 and 3.16 which specifically identified Popham as an accomplice and required that the jury find corroboration of his testimony.[31] We further note

---

[30] CALJIC No. 3.12 provided: "To corroborate the testimony of an accomplice there must be evidence of some act or fact related to the offense which, if believed, by itself and without any aid, interpretation or direction from the testimony of the accomplice, tends to connect the defendant with the commission of the offense charged. [¶] However, it is not necessary that the evidence of corroboration be sufficient in itself to establish every element of the offense charged, or that it corroborate every fact to which the accomplice testifies. [¶] In determining whether an accomplice has been corroborated you must first assume the testimony of the accomplice has been removed from the case. You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the offense. [¶] If there is not such independent evidence which tends to connect defendant with the commission of the offense, the testimony of the accomplice is not corroborated. [¶] If there is such independent evidence which you believe, then the testimony of the accomplice is corroborated."

CALJIC No. 3.18 stated: "The testimony of an accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case."

[31] CALJIC No. 3.10 stated: "An accomplice, namely Earlin Popham is one who is subject to prosecution for the identical offense charged against the defendant on trial. [¶] To be an accomplice, the person must have aided, promoted, encouraged or instigated by act or advice the commission of such offense with knowledge of the unlawful purpose of the person who committed the offense."

CALJIC No. 3.16 stated: "If the crime of murder was committed by anyone, the witness Earlin Popham was an accomplice as a matter of law and his testimony is subject to the rule requiring corroboration."

that CALJIC No. 2.27 benefited the defendant, since that instruction provided authority for the jury to find in favor of defendant, who was the only witness to testify as to his version of many significant facts. (See *Stewart, supra,* 145 Cal.App.3d at pp. 974-975.)

Additionally, both the prosecution and the defense proceeded on the premise that corroboration was required. As in *Chavez, supra,* 39 Cal.3d 823, the prosecutor in the instant case never argued to the jury that it could accept Popham's testimony without corroboration. Rather, her closing argument emphasized in some detail how the testimony of Johnson and other witnesses corroborated Popham's testimony. In sum, we conclude that the jury was correctly instructed on the proper standard for evaluating Popham's testimony, and that the giving of CALJIC No. 2.27 was not erroneous nor prejudicial in this case.

5. *Express Malice Instructions*

■ Among the many instructions which the jury received regarding first degree murder was CALJIC No. 8.10, which stated that defendant was charged with two counts of murder, and then defined that offense as including the element of malice aforethought. Defendant asserts that this instruction was deficient and misleading because it permitted the jury to find defendant guilty of murdering Baby Girl Bunyard based entirely on the malice involved in the killing of her mother. The Attorney General replies that CALJIC No. 8.10 itself does no more than define the elements of murder, and that CALJIC No. 8.10 in conjunction with other first degree murder instructions (CALJIC Nos. 3.31 and 17.02) together clearly state that defendant stood charged with two, separate first degree murders, and that to convict defendant of two first degree murders, the jury had to find the requisite elements as to each victim separately. Defendant claims that these other instructions do not cure the deficiency in CALJIC No. 8.10 and that this instructional error in removing a critical element—malice—from the jury's consideration, denied defendant due process and was prejudicial. (See *Sandstrom* v. *Montana, supra,* 442 U.S. 510, 514 [61 L.Ed.2d at pp. 44-45]; *People* v. *Garcia, supra,* 36 Cal.3d 539, 549, 554.)

Looking at the instructions as a whole, we disagree with defendant's contention that they leave the jury free to find defendant guilty of first degree murder of Baby Girl Bunyard based solely on the finding of express malice as to her mother. The instructions collectively require for conviction of first degree murder as to both victims that defendant acted with express malice, i.e., specific intent to kill. Further, this case was tried and argued exclusively on the theory that both killings were intentional, premeditated, and deliberate first degree murders. Pursuant to the express choice of the

defense, no instructions were given concerning second degree murder, under an implied malice theory or otherwise. Accordingly, we find no deficiency in the instructions on this issue nor removal of the issue of malice from the jury as to the finding of first degree murder of Baby Girl Bunyard.

■■■ Defendant further contends that the giving of CALJIC No. 3.00, which provides in relevant part that "one who aids and abets is not only guilty of the particular crime that to his knowledge his confederate is contemplating committing, but he is also liable for the natural and reasonable or probable consequences of an act that he knowingly aided or encouraged," was error. Defendant argues that under this instruction, if the jury found defendant aided in the killing of Elaine, it had to conclude that he was also responsible for the death of the fetus even if he did not intend it, because it was a natural and reasonable or probable consequence of Elaine's death. Accordingly, defendant contends this portion of CALJIC No. 3.00 denied defendant due process because it permitted the jury to return a murder verdict as to the fetus without a proper finding of malice. (See *Sandstrom* v. *Montana, supra,* 442 U.S. 510, 514 [61 L.Ed.2d 39, 44-45].)

Defendant's claims should be rejected. Although we disapproved of another portion of former CALJIC 3.00 in *Beeman, supra,* 35 Cal.3d 547 (see discussion at pp. 1226-1228, *ante*), we reiterated in *Beeman* that "[t]he liability of an aider and abettor extends also to the natural and reasonable consequences of the acts he knowingly and intentionally aids and encourages." (*Id.* at p. 560.) We expounded on this at greater length in *People* v. *Croy* (1985) 41 Cal.3d 1, 12, at footnote 5 [221 Cal.Rptr. 592, 710 P.2d 392]: "Like the conspirator whose liability is predicated on acts other than and short of those constituting the elements of the charged offense, if the acts are undertaken with the intent that the actual perpetrator's purpose be facilitated, . . . he is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets. [Citation.] . . . . [¶] It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him *for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense which Beeman holds must be found by the jury.*" (Italics added.)

Applying these principles to the instant case, we conclude that once the jury found defendant guilty as an aider and abettor of the first degree

murder of Elaine Bunyard, the jury could have properly convicted him of the first degree murder of Baby Girl Bunyard even without the finding of express malice towards the fetus. The murder of Baby Girl Bunyard under the circumstances of this case—the planned killing of a pregnant woman—was a reasonably foreseeable and, indeed, inevitable offense of the first degree murder of Elaine Bunyard which defendant knowingly and intentionally encouraged and facilitated.[32] Furthermore, defendant received the benefit of several instructions which clearly required that a verdict of first degree murder of Baby Girl Bunyard be based upon the prerequisite finding by the jury of express malice as to the fetus, i.e., specific intent to kill, rather than upon any theory of vicarious liability. In sum, the jury was properly instructed as to the element of express malice with respect to the killing of Baby Girl Bunyard.

### 6. *Instruction on Second Degree Murder With Respect to Baby Girl Bunyard*

Defendant further contends that the court erred in failing to instruct sua sponte on the lesser included offense of second degree murder on an implied malice theory—pursuant to CALJIC No. 8.31—with respect to the killing of Baby Girl Bunyard. The Attorney General asserts that the record expressly reflects that defendant chose to forego instruction on second degree murder as a matter of tactics, thus committing "invited error" that precludes review of this contention as a basis for reversal. Although defendant concedes that he requested no instruction on second degree murder, he claims that the error was not invited because the record indicates that his counsel likely acted out of ignorance or mistake rather than based on informed tactics. We find that the Attorney General's argument is correct.

### (a) *No Sua Sponte Obligation*

 In past cases, we have held that the trial court has a sua sponte obligation to give instructions on necessarily included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense (*People v. Ramkeesoon* (1985) 39 Cal.3d 346, 351 [216 Cal.Rptr. 455, 702 P.2d 613]; *People v. Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311]) "but not when there is no evidence that the offense was less than that charged." (*Wickersham, supra,* 32 Cal.3d

---

[32] Defendant has not challenged the sufficiency of the evidence as to the element of express malice with respect to victim Elaine Bunyard. Moreover, as explained *ante,* in the discussion of *Beeman* error, the jury's finding that defendant "knowingly" aided and abetted the killings here conclusively established intentional aiding and abetting, under the circumstances of this case.

at pp. 323-324; *People* v. *Noah* (1971) 5 Cal.3d 469, 479 [96 Cal.Rptr. 441, 487 P.2d 1009]; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715-716 [112 Cal.Rptr. 1, 518 P.2d 913].) In *Wickersham,* we further explained that this rule "ensures that the jury's attention is properly focused on the relevant legal theories." (*Wickersham, supra,* 32 Cal.3d at p. 325.) ▮ In a first degree murder case, the trial court therefore need not have instructed sua sponte on the necessarily included offense of second degree murder on a theory of implied malice unless there was evidence sufficient to deserve consideration by the jury, i.e., evidence by which a jury composed of reasonable persons could have concluded that defendant had acted intentionally but without express malice. (See *Wickersham, supra,* 32 Cal.3d at p. 325; see also *People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1].)

Defendant argues that Popham's testimony does not provide any evidence that defendant harbored express malice towards the fetus since the only victim mentioned during his alleged conversations with defendant was Elaine. Defendant is mistaken. Popham's testimony provides very strong circumstantial evidence of defendant's express malice towards the unborn child. All of Popham's conversations with defendant concerning the hiring of Popham and the details of the murder plan occurred within three weeks of the murders while both defendant and Popham knew that Elaine was between eight and nine months pregnant. Additionally, defendant's murder-as-suicide plan—killing Elaine while nearly nine months pregnant by means of a close-range shotgun blast to the head—did not evidence mere conscious disregard for the life of the fetus. This particular murder scheme appears to have been designed expressly for the purpose of killing both mother and fetus. Indeed, because of the unique relationship between a mother and her unborn child, death of the fetus was certain and inevitable, not merely highly probable.[33] Moreover, even one day before the murders were carried out, when the baby's birth was expected any day, defendant continued to urge Popham to carry out the murder plan. Had defendant not intended to kill the fetus, it would have been easy enough to delay implementation of the plan until after the birth of Baby Girl Bunyard.

Although defendant argues that there was evidence in the record to support a finding of implied malice with respect to the fetus, he fails to

---

[33] Indeed, the record showed that Elaine was to be knocked unconscious before being killed, thus virtually eliminating the chance that she would be able to somehow overpower Popham and escape. Additionally, the murder was engineered to ensure that Elaine would be alone at the time of Popham's attack: Popham was to kill Elaine after defendant left for work and Elaine's daughter Tanya left for school, and defendant had arranged for his father, also a neighbor of the Bunyards, to be away for the day. Elaine's body was not discovered until several hours after her death.

support this claim with any citations to the record. Our review of the record persuades us that there was no evidence from which the jury could reasonably have concluded that in planning the murder of Elaine—nine months pregnant—he acted with only a wanton or conscious disregard for the life of Baby Girl Bunyard. Defendant simply denied any knowledge or involvement in the killing of his pregnant wife and gave an alibi for his whereabouts on the day of the murders; his testimony did not address his mental state toward Baby Girl Bunyard when he formulated the murder-for-hire plan or facilitated its execution. Thus, the trial court was not obligated to give instructions on second degree murder based on an implied malice theory.

(b) *Invited Error*

 Furthermore, even assuming the evidence was sufficient to support a second degree murder conviction as to Baby Girl Bunyard, we conclude that defendant is barred from challenging the court's failure to give second degree murder instructions under the "invited error" doctrine. "The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal." (*Wickersham, supra,* 32 Cal.3d 307, 330.) For the doctrine to apply, "it must be clear from the record that defense counsel made an express objection to the relevant instructions. In addition, because important rights of the accused are at stake, it also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake." (*Ibid.*) However, "[t]he existence of some conceivable tactical purpose will not support a finding that defense counsel invited an error in instructions. The record must reflect that counsel had a deliberate tactical purpose." (*People* v. *Avalos* (1984) 37 Cal.3d 216, 229 [207 Cal.Rptr. 549, 689 P.2d 121].)

 Here, the record shows that both the prosecution and the defense asked the court to withdraw several second degree murder instructions, i.e., CALJIC Nos. 8.30, 8.70, and 8.71. In response to these requests, the court asked defense counsel whether defendant had personally requested that no instruction be given on second degree murder. After counsel replied in the affirmative, the court then asked: "So that the defendant's position is that it is either murder in the first degree or not at all? Defense counsel replied: "That's right." The court then inquired of defendant personally whether it was his decision also. Defendant replied in the affirmative.

Defendant argues that the foregoing exchange does not reveal whether defendant's request was tactically based on an accurate understanding of

applicable law, or on the ignorant or mistaken impression that no instruction on second degree murder on an implied-malice theory as to the fetus was appropriate under the facts adduced at trial. Defendant argues that the decision to go "all-or-nothing" was tactically justifiable with respect to Elaine's murder, but not as to the fetus. Therefore, defendant argues it is reasonable to conclude that the defense's request that the jury not be instructed on second degree murder with respect to the fetus was based not on informed tactical considerations, but on ignorance and the mistaken view that no theory of second degree murder was factually applicable to the death of the fetus.

Contrary to defendant's claims, we believe the foregoing exchange on the record clearly reflects that the failure to instruct on second degree murder resulted from a deliberate choice by defense counsel as well as defendant personally to utilize an all-or-nothing tactical strategy. Defense counsel's closing argument was entirely consistent with this strategy and the record shows that both sides intended that the case be tried solely on the theory of premeditated, first degree murder, and that the court delete or modify all references and "theories" relating to second degree murder.[34]

Although defendant argues that it would have been better to have given the jury the alternative of implied malice second degree murder as to the fetus because defendant might then have faced the penalty phase with less onerous factors in aggravation—namely, with only one first degree and one second degree murder conviction, instead of two first degree murder convictions—we agree with the Attorney General that this tactic pales in comparison with the well-reasoned, deliberate and informed tactical strategy selected by defense counsel. For if the jury—facing an "all-or-nothing" choice on Baby Girl Bunyard—had found insufficient evidence of express malice as to the fetus, defendant would have suffered only one murder conviction which in turn would have relieved defendant of exposure to the "multiple murder" special circumstance and potential imposition of the death penalty. Indeed, allowing instruction on second degree murder as to the fetus would still

---

[34] To support his claim that defense counsel acted out of ignorance or mistake, defendant contends that the only second degree murder instruction discussed at the instructional conference and expressly waived by the defense was CALJIC No. 8.30 (intentional killing without deliberation and premeditation) but that CALJIC No. 8.31, which defines implied-malice second degree murder, was not discussed at the instructional conference and was not withdrawn at defendant's request. This argument lacks merit. Although the record does not show whether CALJIC No. 8.31 was ever discussed at the instructional conference or expressly waived, defendant's express objection on the record to any instruction on second degree murder necessarily encompassed instruction on the alternative theory of second degree murder defined in CALJIC No. 8.31. Additionally, the jury was instructed pursuant to CALJIC No. 8.11 (definition of malice—express and implied) as modified to delete the definition of "implied malice"—a definition virtually parallel to the one contained in CALJIC No. 8.31— without objection by defendant.

have exposed defendant to the "multiple murder" special circumstance.[35] We are persuaded that even assuming the trial court erred in failing to instruct sua sponte on second degree murder, the error was invited by defense counsel.

### G. *Cumulative Error*

 Defendant further asserts that the errors in this case were "substantial," and that their cumulative impact constituted prejudicial error in a "close" case, requiring reversal of the judgment. (See *People* v. *Holt* (1984) 37 Cal.3d 436, 458-459 [208 Cal.Rptr. 547, 690 P.2d 1207].) Contrary to defendant's claims, we do not find any of these errors to be substantial. The cumulative impact of these errors—the erroneously admitted evidence of Elaine's statements to her attending physician, failure to sua sponte instruct that oral admissions be viewed with caution, *Beeman* error, *supra,* 35 Cal.3d 547 and prosecutorial argument of a matter arguably excluded by *Miranda, supra,* 384 U.S. 436—did not effectively destroy defendant's credibility nor were they exploited in argument. (Cf. *Holt, supra,* 37 Cal.3d at p. 459.) As explained *ante,* each of these errors was harmless when considered individually. Their cumulative effect did not prejudice defendant.

Further, we disagree with defendant's contention that this case is "extremely close" inasmuch as it assertedly turned upon the credibility of the defendant and the two principal prosecution witnesses (Cf. *People* v. *Gonzales* (1967) 66 Cal.2d 482, 494 [58 Cal.Rptr. 361, 426 P.2d 929]; *People* v. *St. Andrew* (1980) 101 Cal.App.3d 450, 465 [161 Cal.Rptr. 634].) First, the fact that defendant independently solicited two friends and employees— who were not acquainted with each other prior to the murders—to kill Elaine belies defendant's characterization of this case as "close." Second, while the jury's determination of defendant's credibility vis-à-vis that of Popham and Johnson was certainly an important issue in the case, of even greater importance was the issue of motive. This case clearly turned primarily on whether it was believable that Popham—indisputably the actual perpetrator of the murders—acted alone, i.e., had any motive to kill Elaine that was independent of defendant's scheme to hire Popham. Put simply, the defense failed to produce any evidence tending to show that Popham had any motive to kill Elaine at variance with the prosecution's theory that he was induced by defendant to kill in return for money and future employment. Because of this flaw in the defense case, and the strong case against defendant, this case was not at all close.[36] Accordingly, we categorically

---

[35] The multiple-murder special circumstance applies whenever the defendant has been convicted "of more than one offense of murder in the first *or second degree.*" (§ 190.2, subd. (a)(3), italics added.)

[36] At the section 190.4, subdivision (e) hearing, the trial court concluded that the "overwhelming weight of the evidence clearly negates the contention of defendant that he did not

reject defendant's characterization of this case as "close on its facts" and conclude that it is not reasonably probable that a result more favorable to the defendant would have been reached in the absence of these errors. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

## III. SPECIAL CIRCUMSTANCES ISSUES

### A. *Fetus Murder Under the Multiple-murder Special Circumstance*

■ Defendant next contends that a conviction for murder of a fetus under section 187 does not constitute an "offense of murder" within the meaning of the multiple-murder special circumstance. (§ 190.2, subdivision (a)(3).) Defendant argues that when the Legislature has intended to extend the protection of the criminal law to a fetus or unborn child, it has expressed that intent in specific terms. (See, e.g., *Justice* v. *Atchison* (1977) 19 Cal.3d 564, 579 [139 Cal.Rptr. 97, 565 P.2d 122]; *In re Steven S.* (1981) 126 Cal.App.3d 23, 28-29 [178 Cal.Rptr. 525]; *Reyes* v. *Superior Court* (1977) 75 Cal.App.3d 214, 219 [141 Cal.Rptr. 912].) Defendant claims that the failure of section 190.2, subdivision (a)(3) to expressly state that it applies to fetuses is an ambiguity in the statute which should be construed to render section 190.2, subdivision (a)(3) inapplicable to the instant case, where a single act has resulted in the death of both the mother and her fetus.

We agree with the Court of Appeal in *People* v. *Smith* (1987) 188 Cal.App.3d 1495 at pages 1516-1518 [234 Cal.Rptr. 142] that there is no ambiguity in section 190.2, subdivision (a)(3) and that read together with section 187, subdivision (a) it is clear that the multiple-murder special circumstance is applicable to the killing—by a single act—of a pregnant

order the killing of the victims." While noting that the jury "passed upon the credibility of Popham and the defendant," the trial court concluded that a review of all the evidence indicated beyond a reasonable doubt that the defendant hired Popham to kill defendant's pregnant wife. The trial court supported this conclusion with a detailed summary of the evidence in the record corroborating Popham's testimony, including references to: (1) Johnson's testimony that he had been offered money to kill Elaine; (2) Johnson's prior consistent statement to his sister Deanna that defendant had offered him money to kill Elaine; (3) Johnson's half-brother, Michael Dotson, having personally overheard defendant tell Johnson—one year before the murders—that his "offer" to Johnson to kill Elaine—which Dotson thought at the time was a joke—was still available; (4) Popham having been observed by another witness to be conversing with defendant at his workplace for ten minutes on the morning of the murders; (5) defendant being observed by a coworker while both were drinking at the Tracton Bar on the afternoon of November 1—the day of the murders—to be moody and to be drinking like he was trying to get drunk; and (6) phone record exhibits that corroborated Popham's testimony that he called from a San Jose phone number to defendant's home two days after the killings.

We are in accord with the trial court's assessment that there was overwhelming evidence of defendant's guilt.

woman and her viable fetus.[37] As in this case, the defendant in *Smith* argued that "because section 190.2, subdivision (a)(3) does not expressly use the word fetus, fetal murder cannot be used to justify the multiple murder special circumstance." (*Id.* at p. 1517.) In rejecting this contention, and holding that the single act of murdering a victim known to the defendant to be pregnant constitutes a multiple murder for purposes of section 190.2, subdivision (a)(3), the Court of Appeal pointed out that the relevant statutes—sections 187, subdivision (a)[38] and 190.2, subdivision (a)(3)—were "clear on their face." (*Ibid.*) "First degree murder of a fetus is still murder. If the fetal murder is in the first or second degree, it can serve as 'more than one offense of murder.' (Pen. Code, § 190.2, subd. (a)(3)). . . ." [¶] "Read together, the two statutes are clear and unambiguous." (*Ibid.*) The Court of Appeal in *Smith* agreed with the position of the Attorney General, stating that "any other interpretation of the statute would unnecessarily destroy the plain meaning of a statute that does not require further judicial construction." (*Smith* at pp. 1517-1518.) "Both sections are facially clear and unambiguous. Judicial interpretation is not necessary where the meaning of words is plain and unambiguous." (*Ibid.*)

We further observe that defendant's construction of the word "murder" in section 190.2, subdivision (a)(3) as different than the use of the same term in section 187 violates an accepted canon of interpretation that it must be presumed that the Legislature, in enacting a statute, is aware of existing related laws and intends to maintain a consistent body of rules. (*Fuentes* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449].) Further, "when a statute defines the meaning to be given to one of its terms, that meaning is ordinarily binding on the courts" (*People* v. *Dillon, supra,* 34 Cal.3d 441, 468), and when a "word or phrase has been given a particular scope or meaning in one part or portion of the law it shall be given the same scope and meaning in other parts or portions . . . ." (*Diachenko* v. *State of California* (1981) 123 Cal.App.3d 932, 938 [177 Cal.Rptr. 164], quoting *Stillwell* v. *State Bar* (1946) 29 Cal.2d 119, 123 [173 P.2d 313].)

Defendant further argues that he is less culpable because his alleged victims died from a single "act," the one-time pulling of a shotgun trigger killing mother and fetus, and that the word "offense" in section 190.2, subdivision (a)(3) should be interpreted to emphasize the number of acts, not merely the number of deaths. Under this interpretation, defendant claims that while two murders for the purpose of section 187 occurred, only

---

[37] Baby Girl Bunyard's viability has not been challenged here. As a healthy, full-term (nine-month-old) fetus, it was viable under any definition.

[38] Since 1970, murder has been defined in California as the "unlawful killing of a human being, or a *fetus,* with malice aforethought." (§ 187, subd. (a), italics added.)

one "offense of murder" for the purpose of section 190.2, subdivision (a)(3) occurred. Defendant's interpretation is simply not supported by the plain, unambiguous language of section 190.2, subdivision (a)(3). Additionally, defendant's interpretation defies reason. As pointed out by the Attorney General, if defendant's logic prevailed, a defendant who shot each passenger in a hijacked airplane seriatim would be subject to the special circumstance, whereas a defendant who killed the same number of persons by exploding a single bomb would not. We decline to adopt defendant's interpretation that the shotgun killing of a pregnant woman and her viable fetus in this case is a single "offense of murder" for the purpose of the multiple-murder special circumstance.

Defendant further argues that construing section 190.2, subdivision (a)(3) to preclude application where one of the victims is a fetus would avoid the question of the possible unconstitutionality of that subdivision under the Eighth Amendment to the United States Constitution or article I, section 17 of the California Constitution. Defendant notes that in past cases we have held that statutes and initiatives dealing with criminal law in general, and defining special circumstances in particular, should be construed so as to avoid doubts as to their constitutionality. (See, e.g., *People* v. *Smith* (1983) 34 Cal.3d 251, 259 [667 P.2d 149]; *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 147-152 [197 Cal.Rptr. 79, 672 P.2d 862].) Defendant contends that the potential constitutional infirmity in section 190.2, subdivision (a)(3) concerns whether the murder of a fetus may raise an otherwise noncapital case to capital status under a multiple-murder special circumstance. In support of this argument, defendant notes that California is one of only three states in which feticide can possibly qualify as murder for a state's multiple-homicide aggravating circumstance. Defendant emphasizes that one of the objective factors for determining whether a punishment for an offense violates the Eighth Amendment and article I, section 17 of the California Constitution is the comparison of sentences imposed for commission of the same crime in other jurisdictions. (*Solem* v. *Helm* (1983) 463 U.S. 277, 291-292 [77 L.Ed.2d 637, 650, 103 S.Ct. 3001]; *In re Lynch* (1972) 8 Cal.3d 410, 427 [105 Cal.Rptr. 217, 503 P.2d 921].)

Defendant's argument lacks merit. The heart of defendant's argument seems to be that since at common law feticide was not even a felony (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 625-626 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420]), and could not make a defendant eligible for the death penalty, and most jurisdictions do not consider a fetus a person for the purposes of the murder statute or for imposition of the death penalty, application of the multiple-murder special circumstance to the present situation—where the victims are a pregnant woman and her viable fetus—is constitutionally infirm. While defendant's argument is provocative, it does

not establish cruel or unusual punishment under the relevant criteria formulated by either this court or our high court.

In determining whether a particular sentence constitutes cruel or unusual punishment under the state Constitution (art. I, § 17), we must determine whether the penalty "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch, supra,* 8 Cal.3d at p. 424; *People* v. *Frierson* (1979) 25 Cal.3d 142, 183 [158 Cal.Rptr. 281, 599 P.2d 587].) Defendant presents no evidence or argument regarding two of the factors we held relevant in determining disproportionality under *Lynch*—the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society, and whether more serious crimes are punished in this state less severely than the offense in question. The offense at issue— wilful, deliberate and premeditated murder—creates the utmost danger to society. The fact that the victim murdered is an unborn child does not render defendant less culpable, or the crime less severe, in light of the Legislature's determination that viable fetuses receive the same protection under the murder statute as persons.

Defendant's arguments suggesting a potential Eighth Amendment violation also fail. Our high court has established that one of the objective factors for reviewing the proportionality of sentences under the Eighth Amendment is the "gravity of the offense." Murder is the gravest of all, a crime "so grievous an affront to humanity that the only adequate response may be the penalty of death." (*Gregg* v. *Georgia,* (1976) 428 U.S. 153, 184 [49 L.Ed.2d 859, 881, 96 S.Ct. 2909].) Since the evidence in this case was sufficient to establish that defendant acted with express malice towards Baby Girl Bunyard, this case raises no questions of death-eligibility under *Tison* v. *Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127, 107 S.Ct. 1676]. "A critical facet of the individualized determination of culpability required in capital cases is the mental state with which the defendant commits the crime. Deeply engrained in our legal tradition is the idea that the more purposeful is the criminal conduct, the more serious is the offense, and therefore, the more severely it ought to be punished." (*Tison, supra,* 481 U.S. at p. 156 [95 L.Ed.2d at p. 143, 107 S.Ct. at p. 1687].) Additionally, defendant fails to present any evidence or argument concerning other relevant criteria for reviewing a claim of Eighth Amendment violation—the sentencing decisions made by juries, and the charging practices of prosecutors—with respect to the imposition of the death penalty for the murder of a pregnant woman and her viable fetus.

Defendant's assertion that only three jurisdictions having multiple-homicide special circumstances would permit a feticide to qualify as a homicide

within the ambit of the statute needs to be placed in proper context. First, defendant himself states that only 19 states have multiple-homicide special circumstances, and of these, only 14 states have statutes which could apply to 2 murders jointly tried. As defendant also admits, in 11 of these 14 states the death of a fetus plainly does not qualify as one of the multiple murders, the reason being that in most of these jurisdictions the killing of a fetus has not been determined to be "murder," as distinguished from California where section 187 expressly extends the protection of the murder statute to fetuses. Thus, defendant's examination of the sentencing schemes of other jurisdictions fails to consider the significant distinction that not all jurisdictions make the unlawful killing of a viable fetus a homicide, or a murder, at all.

In sum, we find no federal or state constitutional infirmity in applying the multiple-murder special circumstance to the circumstances in this case.

### B. *Specific Intent to Kill*

■ Relying on our decision in *People* v. *Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669], defendant argues that the court erred in failing to instruct the jury that the multiple-murder special circumstance could be found true only if defendant harbored an intent to kill. The Attorney General submits that since defendant was tried exclusively on a theory of intentional, premeditated first degree murder, and was convicted of two first degree murders, *Turner* has no application. We agree with the Attorney General and find no *Turner* error.

In *Turner,* we vacated multiple-murder special circumstance findings where the two killings had both been tried on a felony-murder theory. We found that subdivision (b) of section 190.2 was not limited to the felony-murder special circumstance (§ 190.2, subd. (a)(17)), but had equal application to subdivision (a), paragraph (3), the multiple-murder special circumstance. However, our invalidation of the multiple-murder special circumstances in *Turner* was predicated upon the fact that both of the first degree felony-murder killings were unintentional; hence, we concluded that "no different analysis is required because two persons instead of one were unintentionally killed." (*Turner, supra,* 37 Cal.3d at p. 329.)

In the present case, however, defendant was "tried on a theory of, and convicted of, deliberate and premeditated murder, *not* felony murder. *Turner* is therefore inapplicable." (*People* v. *Dyer, supra,* 45 Cal.3d 26, 28.)[39]

---

[39] The jury received numerous instructions requiring the finding of intent to kill with respect to both Elaine and Baby Girl Bunyard. The jury was instructed that "murder" requires "malice aforethought" (CALJIC No. 8.10 (1979 rev.)); that "express malice" exists "when

In *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], we interpreted section 190.2, subdivision (b) to require proof that an aider and abettor—but not an actual killer—acted with intent to kill before any special circumstance with the exception of a prior murder conviction could be found true. Since defendant Bunyard was not the actual perpetrator of the first degree murders, he should be considered an aider and abettor for the purpose of section 190.2, subdivision (b). Although the trial court did not instruct the jury at the consolidated guilt and special circumstances phase in the language of section 190.2, subdivision (b), we need not decide whether such an omission constitutes error in the present case since any conceivable error would have been harmless beyond a reasonable doubt. (See *People* v. *Odle, supra,* 45 Cal.3d 386, 410-416.) As explained *ante* in our discussion of *Beeman* error, *supra,* 35 Cal.3d 547, the circumstances of this case, including the other specific-intent jury instructions given, the unique relationship between a pregnant woman and her unborn fetus, and counsel's arguments, show that the jury necessarily found that defendant acted with specific intent to kill Elaine and Baby Girl Bunyard. Accordingly, the jury, in finding the multiple-murder special circumstance true, must have found that defendant intentionally aided or abetted Popham in the commission of the murders as required by section 190.2, subdivision (b).

## IV. PENALTY ISSUES

### A. *Ramos Error*

■■■ Defendant contends that the court committed reversible error under *People* v. *Ramos, supra,* 37 Cal.3d 136 (hereafter *Ramos II* ). The jury was instructed in the unadorned language of CALJIC No. 8.84.2, in accordance with the so-called Briggs Instruction as follows: "You are instructed that under the State Constitution, a governor is empowered to grant a reprieve, a pardon or commutation after sentence following conviction of a crime. Under this power a governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole."

In *Ramos II, supra,* 37 Cal.3d at page 153, this court held "the Briggs Instruction is incompatible with [the] guarantee of 'fundamental fairness'

there is manifested an intent to unlawfully kill a human being" (CALJIC No. 8.11 (1979 rev.)); that "willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree" (CALJIC No. 8.20 (1979 rev.)); that "willful" means "intentional" (*ibid.*); that if the jury found that the killing was "preceded and accompanied by a clear, deliberate intent on the part of the *defendant* to kill, which was the result of deliberation and premeditation . . . it is murder of the first degree" (*ibid.,* italics added); and that to convict defendant of two first degree murders, the jury had to find the requisite element of specific intent to unlawfully kill a human being or a fetus with respect to each murder count. (CALJIC No. 3.31.)

[established in the due process clauses of our Constitution (Cal. Const., art. I, §§ 7, 15)] both because it is seriously and prejudicially misleading and because it invites the jury to be influenced by speculative and improper considerations." When a court charges the jury in accordance with this instruction, it commits serious error and necessarily subjects the defendant to prejudice. (*People* v. *Montiel* (1985) 39 Cal.3d 910, 928 [218 Cal.Rptr. 572, 705 P.2d 1248]; accord, *People* v. *Anderson, supra,* 43 Cal.3d 1104, 1150-1151; see generally *Ramos II, supra,* 37 Cal.3d at pp. 153-159.)

The Attorney General argues we should reverse our holding in *Ramos II, supra,* 37 Cal.3d 136, and follow the majority opinion of our high court in *California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446]. Virtually all of the Attorney General's arguments were rejected by this court in *Ramos II*; we are unpersuaded that they merit reconsideration.

■ The Attorney General additionally contends that this court in deciding *Ramos II* departed from precedent in failing to present any of the "persuasive reasons" established in *People* v. *Teresinski* (1982) 30 Cal.3d 822 [180 Cal.Rptr. 617, 640 P.2d 753] for resolving *Ramos II* on independent state constitutional grounds and not following *California* v. *Ramos, supra,* 463 U.S. 992. The Attorney General is mistaken. In *Teresinski,* we stated: "Decisions of the United States Supreme Court . . . are entitled to respectful consideration [citations] and ought to be followed unless persuasive reasons are presented for taking a different course." (30 Cal.3d at p. 836.) As pointed out by defendant, one of the factors established by this court in *Teresinski* for relying on the California Constitution is where the federal decision, if followed, would overturn California doctrine affording greater rights to the defendant. (*Id.* at pp. 837.) The decision in *California* v. *Ramos* would clearly overturn established California doctrine affording greater rights to the defendant. For over 20 years, this court has consistently disapproved instructions identical or similar to the Briggs Instruction (see, e.g., *People* v. *Morse* (1964) 60 Cal.2d 631, 636-653, 657 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]; *In re Gaines* (1965) 63 Cal.2d 234, 236 [45 Cal.Rptr. 865, 404 P.2d 473]; *People* v. *Haskett* (1982) 30 Cal.3d 841, 861-863 [180 Cal.Rptr. 640, 640 P.2d 776]; *People* v. *Montiel* (1985) 39 Cal.3d 910, 928; *People* v. *Myers* (1987) 43 Cal.3d 250, 270-272 [233 Cal.Rptr. 264, 729 P.2d 698]; *People* v. *Anderson, supra,* 43 Cal.3d 1104, 1150-1151).

■ The Attorney General submits that even if this court continues to hold that the giving of the Briggs Instruction constitutes error, it should permit the application of the doctrine of harmless error. In this case, the Attorney General, while conceding that the instruction was unadorned, argues that neither the prosecutor nor the court emphasized the instruction,

and that when the prosecutor began to mention the Governor's commutation power in argument, the court admonished the jury to disregard the comment. Thus, the Attorney General argues that the instruction cannot reasonably be viewed as a substantial error because there is no reasonable possibility that it affected the verdict.

We reject the claim that the giving of the Briggs Instruction was harmless in this case. Contrary to the Attorney General's claims, the prosecutor *did* emphasize the Briggs Instruction, arguing as follows: "[T]he witness called by the defendant during this phase of the trial basically told you the truth when he said nobody stays in prison forever, no lifer stays in prison forever more than 30 or 40 years. Because his Honor will further instruct you under the state constitution a governor is empowered to grant a reprieve, pardon, or commutation after sentence following the conviction of a crime so that, in other words, if you make your decision, that is not necessarily the final decision. Because if it's life in prison without possibility of parole, there is another arbiter that can change your verdict, the governor of the state." In response to this argument, expressly linking the fact that "lifers" do not stay in prison with the Governor's commutation power in the apparent effort to influence the jurors to impose death (see *People* v. *Davenport* (1985) 41 Cal.3d 247, 287-288 [221 Cal.Rptr. 794, 710 P.2d 861] [prosecutorial argument discussing the commutation power held improper under *Ramos II, supra,* 37 Cal.3d 136, even in the absence of the Briggs Instruction]) the court admonished the jury "to disregard that last statement about there being another arbiter to your judgment. Any judgment that you return as to this case as to the punishment must be strictly as interpreted by the Code. All right. And not what anyone else does." Immediately following this admonition, the prosecutor next stated: "You can listen to the instruction when his Honor reads it, and I think I have stated it correctly." Significantly, the court did not admonish the jury to disregard this last statement, and at the close of the penalty phase arguments proceeded to give the jury the unadorned Briggs Instruction without any "curative" instruction to the effect that it would be a violation of the jury's duty to consider the possibility of commutation in determining the appropriate sentence. (See *Ramos II, supra,* 37 Cal.3d 136, 159, fn. 12, *People* v. *Hamilton* (1988) 45 Cal.3d 351, 372-376 [247 Cal.Rptr. 31, 753 P.2d 1109].)

The court's admonishment of the jury to disregard the prosecutor's statements clearly fell far short of the functional equivalent of a "curative" instruction. Rather, the court merely advised the jury to disregard the prosecutor's *argument* as to their being another arbiter, but did not tell the jury to disregard the *court's instruction*—i.e., the Briggs Instruction—that the Governor had the power to commute a sentence of life without possibility of parole. Indeed, the court's directive to the jury that they must return a

punishment as "interpreted strictly by the Code" would signify to a reasonable juror that they were to follow the law, i.e., the instructions given by the court, including the unadorned Briggs Instruction. Moreover, the jury was specifically instructed that it was their duty to accept, and follow, the rules of law delivered by the court. In the absence of an instruction that the jury should not consider the possibility of commutation in determining defendant's sentence, the jury would reasonably infer from the misleading character of the Briggs Instruction that as to a sentence of life without possibility of parole, the Governor and not the jury was the "final arbiter" because of his commutation power. The court's "admonition" was clearly insufficient to dispel the very serious potential for prejudice that inevitably flowed from the prosecutor's argument and the giving of the Briggs Instruction—that the jury might sentence defendant to death rather than life without possibility of parole simply out of fear that the Governor would exercise his commutation powers and release the defendant while he was still dangerous. In sum, we cannot confidently conclude that this instruction did not improperly taint the jury's decisionmaking process. (*People* v. *Myers, supra,* 43 Cal.3d 250, 270-273; accord, *People* v. *Anderson, supra,* 43 Cal.3d 1104, 1150-1151; *Montiel, supra,* 39 Cal.3d at p. 928.)

## B. *Additional Penalty Phase Contentions*

In addition to the Briggs Instruction, defendant contends that the penalty judgment should be reversed due to several other errors that allegedly occurred at the penalty phase. Because we have concluded that the giving of the unadorned Briggs Instruction requires that the penalty judgment be reversed, we need not decide whether the additional matters raised by defendant would in themselves require reversal. Since any new penalty trial will be conducted in light of our recent rulings, there is no reason to anticipate that any asserted error will recur.

We conclude that the court committed reversible error by charging the jury in accordance with an unadorned Briggs Instruction. Accordingly, under the governing precedent, we hold that the judgment of death must be reversed.

The judgment is affirmed as to guilt; the special circumstance finding is upheld; and the judgment is reversed as to penalty.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., and Eagleson, J., concurred.

KAUFMAN, J.—I concur fully in the affirmance of the convictions and special circumstance finding. I concur in reversal of the death penalty under

compulsion of *People* v. *Ramos* (1984) 37 Cal.3d 136, 150-159 [207 Cal.Rptr. 800, 689 P.2d 430] and *People* v. *Montiel* (1985) 39 Cal.3d 910, 928 [218 Cal.Rptr. 572, 705 P.2d 1248]. Had the prosecutor not exploited the Briggs Instruction I would have held the giving of the instruction harmless beyond a reasonable doubt on the facts of this case.

Appellant's petition for a rehearing was denied September 1, 1988, and the opinion was modified to read as printed above.