Filed 12/4/14  P. v. Rivera CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CESAR RIVERA,<br><br>        Defendant and Appellant. | A139988<br><br>(City and County of San Francisco<br>Super. Ct. No. 220465) |

        A jury convicted Cesar Rivera of disobeying a domestic relations court order and attempting to disobey a domestic relations court order, both misdemeanors.  He contends the evidence that he knew of or had the opportunity to read the order was insufficient to support the verdict.  Substantial evidence supports the verdict, so we affirm.

## BACKGROUND

        Rivera and Lauren Anzalone became engaged in December 2012 after a brief courtship.  Anzalone soon began to harbor doubts about their relationship, largely due to Rivera's jealousy and possessiveness.  In mid-April 2013 she voiced her concerns to Rivera.  She tried to give back her engagement ring, but he became angry and she continued to wear the ring to assuage him.  Soon afterward she stopped wearing the ring, explaining to Rivera that she was unhappy in the relationship and that his jealousy was a problem.

        On April 26 Anzalone texted Rivera not to pick her up at the restaurant where she worked, as he usually did, because she was going out with some coworkers.  Anzalone, Claudio Aramburu, and several other coworkers finished work at midnight and went to a

1

bar called the Wreck Room.  As they left around 1:30 a.m., Aramburu and Anzalone were walking with their arms around each other when "out of nowhere" Rivera ran up from behind and hit Aramburu on the back of his head, knocking him to the ground.  Rivera kicked Aramburu two or three times as Anzalone screamed at him to stop.  She pushed Rivera toward his car and the two drove off together as Anzalone's coworkers rushed to Aramburu's aid.  When Anzalone and Rivera arrived at Anzalone's house she put his belongings in his car and told him the relationship was over.

Rivera called Aramburu around 2:30 that morning.  He said he "he just couldn't control himself" after he saw Aramburu dancing with Anzalone at the Wreck Room, and warned Aramburu to stay away from Anzalone.

Aramburu and Anzalone went out together again on May 1 and May 2.  On May 2, Aramburu spent the night with Anzalone at her home.  Around midnight, Anzalone heard her window blinds rattle and looked to see Rivera at the window directly above her bed.  She screamed "No!" and pushed his face as hard as she could in an attempt to keep him out.  Rivera nonetheless pushed through the window and "belly flopped" onto the bed.  Aramburu grabbed Rivera and was trying to push him toward the bedroom door when Anzalone's housemates responded to the ruckus and helped him wrangle Rivera into the hallway.  Anzalone called the police, who arrived promptly and arrested Rivera as he was walking away from the building.

At 1:55 that morning San Francisco Police Officer Phillip Frenkel obtained an emergency protective order that directed Rivera to stay at least 100 yards away from Anzalone, her home and her place of work and prohibited him from calling or otherwise contacting her.  Rivera was "a bit" irrational, rambling about his troubles with Anzalone, but he was not under the influence of drugs or alcohol.  He had a cut on the bridge of his nose and complained of neck pain.  Rivera spoke English and did not ask if the officers spoke Spanish or for an interpreter.

Officer Frenkel brought a copy of the emergency protective order into Rivera's cell and read it to him as Officer Erik Leung observed.  Officer Frenkel held the written order about 13 inches from Rivera's face and pointed out each section as he read it aloud.

Rivera said he did not believe what was happening to him. He was distraught and "a little erratic." As Officer Frenkel read the protective order Rivera shook his head and said "I don't want this." He may have started to cry. Officer Leung told Rivera that the protective order was effective "whether he wanted it or not."

Officers Frenkel and Leung directed Rivera to sign the protective order, but he refused. The officers then realized that no signature was required and told Rivera so, explaining also that a copy of the protective order would be put with his personal property and given to him upon his release. Officer Frenkel filled out a proof of service of the order at 3:15 a.m. Rivera was transported to San Francisco General Hospital, where he was treated for a broken nose and abrasions.

Rivera called Anzalone from jail 23 times that morning, starting around 5:00 or 6:00 a.m. At 10:30 a.m. she answered his 23rd call because she felt guilty and wanted him to stop calling. Rivera asked her to tell the police that he did nothing wrong.

Rivera testified that he told Officer Frenkel he needed a Spanish interpreter, although he spoke with the officers and wrote a statement in English. He denied that Frenkel showed or read him the emergency protective order and testified on cross-examination that he first learned about it, from Inspector John Keane, after he made his calls to Anzalone. On rebuttal, Inspector Keane testified that he spoke with Rivera in jail but did not discuss the protective order.

The jury found Rivera guilty of misdemeanor disobeying a domestic relations court order and misdemeanor attempted disobeying a domestic relations court order, and found him not guilty of battery with serious bodily injury. The jury was unable to reach a verdict on other related charges, which were dismissed. Rivera was placed on three years' probation and timely appealed.

## DISCUSSION

The principles governing our review are well settled. "When an appellant attacks the sufficiency of the evidence to support a conviction, this court must examine the entire record in the light most favorable to the judgment below and presume in support of the

3

judgment the existence of every fact that can reasonably be deduced from the evidence. [Citation.]  Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom.  [Citation.]  If the circumstances reasonably justify the findings of the trier of fact as to each element of the offense, an opinion of the reviewing court that the circumstances might also lead to a contrary finding does not warrant reversal."  (*In re Leland D.* (1990) 223 Cal.App.3d 251, 258; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1213.)

Rivera argues the evidence was insufficient to prove he knew about the protective order and that he had the opportunity to read it or otherwise become familiar with its terms.  (See CALCRIM No. 2701 [prosecution must prove the defendant's knowledge of and opportunity to apprise himself of its contents].)  His argument is premised on his heartbreak and shock at seeing Anzalone in bed with another man, which caused him to be distraught and irrational when Officer Frenkel read and showed him the protective order.  Rivera further observes that his nose was broken, that he was handcuffed to a bench, that English is not his native tongue, and that Officer Frenkel did not give him a copy of the order or let him hold it.  But the question before us is whether substantial evidence supports the jurors' finding that Rivera *did* have the opportunity to become familiar with the terms of the protective order, not whether the evidence might also have supported the contrary conclusion.  The testimony of Officers Frenkel and Leung and Inspector Keane constitute substantial evidence that defendant was informed of the protective order and adequately apprised of its contents, so we may not interfere with the jurors' determination.

## DISPOSITION

The judgment is affirmed.

4

_____
Siggins, J.

We concur:


_____
Pollak, Acting P.J.


_____
Jenkins, J.